## IN RE MELODY L. ET AL.*
### (SC 18085)
### (SC 18086)
### (SC 18087)

Rogers, C. J., and Norcott, Vertefeuille, Zarella and Schaller, Js.

---

\* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued March 11, 2008—officially released January 20, 2009

*Sarah Eagan*, with whom was *Martha Stone*, for the appellants in Docket Nos. SC 18085 and SC 18087 (minor child Melody L. et al.).

*Raymond J. Rigat*, for the appellant in Docket No. SC 18085 (minor child Neri Jasmin R.).

*Sue A. Cousineau*, for the appellant in Docket No. SC 18085 (minor child Jenira R.).

*Marcia McCormack*, for the appellant in Docket No. SC 18086 (respondent mother).

*Tammy Nguyen-O'Dowd*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Susan T. Pearlman*, assistant attorney general, for the appellee in each case (petitioner).

*Mildred Doody*, for the appellee in Docket Nos. SC 18085 and SC 18086 (minor child Melinda L.).

*Opinion*

VERTEFEUILLE, J. These three appeals arise from the termination of the parental rights of the respondent mother, Neri C.,[1] to five[2] of her minor children, Melody L., Melinda L., Jenira R., Jaime R. and Neri Jasmin R. The respondent appeals from the judgments of the trial court terminating her parental rights as to the five chil-

[1] Default judgments were rendered against the fathers of the five minor children, and they have not appealed. We refer in this opinion to the mother as the respondent.

[2] The respondent has a total of seven children. Her two oldest sons, Malcolm and Marcus, are not involved in these appeals but are mentioned in various discussions of the facts in this opinion.

dren (SC 18086). In the two additional appeals, four of the children[3] appeal from the judgments of the trial court terminating the parental rights of the respondent (SC 18085) and from the court's subsequent denial of their motion for visitation with the respondent pending the appeal of the termination of parental rights (SC 18087).[4] We affirm the judgments in the appeals pertaining to the termination of parental rights, and we dismiss the appeal pertaining to the motion for visitation as moot.

The record reveals the following facts, as found by the trial court, and relevant procedural history. In May, 2002, the department of children and families (department) received an anonymous telephone call reporting that the respondent, the respondent's boyfriend (boyfriend) and her six[5] children recently had moved to Connecticut from New York and were living in a one bedroom apartment in Hartford. The anonymous caller further reported that the children were being exposed to sexual activity between the adults and were being sexually abused by the boyfriend.

The department thereafter conducted a home visit and began an investigation. Through its investigation, the department learned that the respondent and her boyfriend had a history of substance abuse and that the respondent had relapsed. The department also became aware that the respondent had an active case with the

[3] We note that one of the minor children, Melinda, originally was an appellant in the children's two appeals (SC 18085 and SC 18087), but subsequently withdrew from both. She subsequently filed briefs as an appellee in the two appeals pertaining to the termination of the respondent's parental rights seeking to affirm the trial court's judgments.

[4] The respondent and the children appealed from the judgments of the trial court to the Appellate Court, and we transferred the appeals to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[5] The respondent's youngest child, Neri Jasmin, had not been born at the time the department received the telephone call. She was born in January, 2003.

New York state office of children and family services, child protective services, " 'for excessive corporal punishment and sexual abuse.' " The New York agency informed the department that the respondent's boyfriend had sexually abused Melody and exposed her to pornography, and as a result, the respondent had been ordered to prevent the boyfriend from having contact with the children. The department was further informed that the respondent had violated that order, and that a New York court had ordered her to turn the children over to New York child protective services. The respondent failed to comply with the court's order and subsequently fled New York with her boyfriend and the children. As a result, in May, 2002, the department removed the four minor children from the home on a ninety-six hour hold pursuant to General Statutes § 17a-101g.[6] The oldest of the four, Melody, was then seven years old.

---

[6] General Statutes § 17a-101g provides in relevant part: "(e) If the Commissioner of Children and Families, or the commissioner's designee, has probable cause to believe that the child or any other child in the household is in imminent risk of physical harm from the child's surroundings and that immediate removal from such surroundings is necessary to ensure the child's safety, the commissioner, or the commissioner's designee, shall authorize any employee of the department or any law enforcement officer to remove the child and any other child similarly situated from such surroundings without the consent of the child's parent or guardian. The commissioner shall record in writing the reasons for such removal and include such record with the report of the investigation conducted under subsection (b) of this section.

"(f) The removal of a child pursuant to subsection (e) of this section shall not exceed ninety-six hours. During the period of such removal, the commissioner, or the commissioner's designee, shall provide the child with all necessary care, including medical care, which may include an examination by a physician or mental health professional with or without the consent of the child's parents, guardian or other person responsible for the child's care, provided reasonable attempts have been made to obtain consent of the child's parents or guardian or other person responsible for the care of such child. During the course of a medical examination, a physician may perform diagnostic tests and procedures necessary for the detection of child abuse or neglect. If the child is not returned home within such ninety-six-hour period, with or without protective services, the department shall proceed in accordance with section 46b-129."

During its continuing investigation, the department further learned that the respondent had moved to Connecticut with her boyfriend and her six children in January, 2002. Once in Connecticut, the respondent failed to enroll any of the children in school. The respondent, her boyfriend and all six children were sleeping together in one bedroom with two beds. During this time, the respondent and her boyfriend engaged in sexual intercourse on numerous occasions in the presence of the children. In addition, both the respondent and her boyfriend physically abused the minor children when disciplining them. In August, 2002, the children were adjudicated neglected and committed to the care and custody of the department. As part of the judgment, the trial court ordered specific steps for the respondent to take to facilitate the return of the children to her, including that she have no further contact with her boyfriend.

In December, 2002, the department received a telephone call reporting that Jenira had informed her foster mother that the boyfriend had touched her inappropriately while she was taking a bath during a supervised visit with the respondent. The report of sexual abuse was confirmed during the department's interview with Jenira. The respondent admitted that she was still cohabiting with the boyfriend at that time, explaining that she needed his assistance during her pregnancy with Neri Jasmin. The boyfriend drove the respondent to the hospital for the birth of Neri Jasmin, who was born on January 25, 2003.

In February, 2003, the department received a telephone call reporting that Melinda had informed her

We note that § 17a-101g was amended subsequent to the time of the department's action in this case by, inter alia, the addition of new subsections and the redesignation of certain previously existing subsections. See Public Acts 2005, No. 05-207, § 2. Subsections currently designated as (e) and (f) were designated as (c) and (d) in 2002. For purposes of clarity, we refer to the present revision of the statute.

foster mother of a new allegation of abuse, namely, that the boyfriend had sexually abused her while she was in the bathtub, and also had sexually abused Melody and Jenira. Melinda also reported multiple incidents of physical abuse by the boyfriend. Melinda informed the department that she had told the respondent about the abuse and that the respondent had told the children to tell the boyfriend to stop touching them. During an interview with the department, the respondent denied having any knowledge of the sexual abuse and denied that there had been any unsupervised contact between the boyfriend and Neri Jasmin. On the basis of the disclosures and the respondent's continued contact with the boyfriend, the department removed Neri Jasmin from the home on a ninety-six hour hold pursuant to § 17a-101g. In September, 2003, Neri Jasmin was adjudicated neglected and was committed to the custody of the department.

The department interviewed Melody on two occasions in February, 2003. Melody stated that the respondent and her boyfriend had engaged in substance abuse in front of the children when they lived in New York and that they had allowed the oldest child, Malcolm; see footnote 2 of this opinion; to smoke marijuana in the home. Melody also reported multiple prior incidents of sexual abuse by the boyfriend.

As a result of these disclosures, the department referred Melody to the Aetna Children's Center at Saint Francis Hospital and Medical Center (hospital). During an interview at the hospital, at which a department employee was present, Melody disclosed multiple incidents of sexual abuse by the boyfriend, including penetration and oral sex. Melody further reported that the respondent and the boyfriend would have sexual relations in her presence. Melody also reported that the boyfriend would instruct her teenage brother Marcus; see footnote 2 of this opinion; to "hump her" and put

his penis on her buttocks while in the bathtub together. During this interview, Melody stated that she had reported the sexual abuse to the respondent at least four times.

The department interviewed Marcus, who confirmed Melody's reports of sexual abuse. He informed a department employee that the respondent and the boyfriend would have sexual intercourse in the presence of the children and that the boyfriend would talk to him about sex. He also confirmed that the boyfriend would make him get into the bathtub with Melody and direct him to put his penis on her vagina, while the boyfriend watched.

Throughout this period of time from May, 2002, and continuing well into 2005, the department's goal was to reunify the respondent with her children. She regularly visited with the children, who were generally doing well in their foster homes, and she and the children were being provided services intended to assist in the reunification of the family. In April, 2005, Marcus, who had significant behavior problems and previously had been removed by the department from the respondent's home, returned to live with the respondent. In July of that same year, Jaime returned to the respondent's home to live. The respondent thereafter became overwhelmed with her parental responsibilities for Marcus and Jaime at home. She hit one of the boys twice; she allowed Marcus' health insurance to lapse; she failed to pick up prescription medicine for Marcus and he suffered a seizure as a result; and she left Jaime and the other children, when visiting, in Marcus' supervision despite having been warned not to do so. Marcus also frightened the other children by tormenting the family cat in front of them. In December, 2005, Marcus and Jaime again were removed from the respondent's custody. During December, 2005, and January, 2006, the respondent refused to take a test to determine whether

she was again abusing drugs, she stopped seeing her psychiatrist and she stopped taking her prescribed medications. As of January, 2006, the older children had been in the department's custody since May, 2002, and Neri Jasmin since February, 2003.

In January, 2006, pursuant to General Statutes § 17a-112 (j),[7] the commissioner of children and families

[7] General Statutes § 17a-112 (j) provides: "The Superior Court, upon notice and hearing as provided in sections 45a-716 and 45a-717, may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that (1) the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent in accordance with subsection (a) of section 17a-111b, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, except that such finding is not required if the court has determined at a hearing pursuant to section 17a-111b, or determines at trial on the petition, that such efforts are not required, (2) termination is in the best interest of the child, and (3) (A) the child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child; (B) the child (i) has been found by the Superior Court or the Probate Court to have been neglected or uncared for in a prior proceeding, or (ii) is found to be neglected or uncared for and has been in the custody of the commissioner for at least fifteen months and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child; (C) the child has been denied, by reason of an act or acts of parental commission or omission including, but not limited to, sexual molestation or exploitation, severe physical abuse or a pattern of abuse, the care, guidance or control necessary for the child's physical, educational, moral or emotional well-being, except that nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights; (D) there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child; (E) the parent of a child under the age of seven years who is neglected or uncared for, has failed, is unable or is unwilling to achieve such degree of personal rehabilitation as would encourage the belief that within a reason-

(commissioner) filed petitions to terminate the parental rights of the respondent to the five youngest children.[8] As grounds for the termination, the commissioner alleged, pursuant to statute, that the children had been adjudicated neglected and committed to the department, that the respondent had been provided specific steps to take to facilitate the children's return and that she had "failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, [the respondent] could assume a responsible position in the life of the child . . . ." General Statutes § 17a-112 (j) (3) (B) (ii). The commissioner further alleged, pursuant to § 17a-112 (j) (3) (C), that the children had been denied "the care, guidance or control necessary for [their] physical, educational, moral or emotional well-being" by reason of the respondent's acts of commission or omission.

After a lengthy trial, the trial court granted the petitions for termination. In its memorandum of decision, the trial court first determined that "prior to filing its

able period of time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child and such parent's parental rights of another child were previously terminated pursuant to a petition filed by the Commissioner of Children and Families; (F) the parent has killed through deliberate, nonaccidental act another child of the parent or has requested, commanded, importuned, attempted, conspired or solicited such killing or has committed an assault, through deliberate, nonaccidental act that resulted in serious bodily injury of another child of the parent; or (G) the parent was convicted as an adult or a delinquent by a court of competent jurisdiction of a sexual assault resulting in the conception of the child, except a conviction for a violation of section 53a-71 or 53a-73a, provided the court may terminate such parent's parental rights to such child at any time after such conviction."

Section 17a-112 (j) was amended by No. 06-102, § 7, of the 2006 Public Acts, which made several technical changes to the statute that are not relevant to this appeal. For purposes of clarity, we refer to the present revision of the statute.

[8] The department also petitioned for the termination of the parental rights of the children's fathers. See footnote 1 of this opinion.

termination petitions, [the department] made reasonable efforts to reunify each of the children with the [respondent] . . . through offers of and provision of services . . . ." The trial court then found that, "by clear and convincing evidence, as to the [respondent] that [the department] has proved [the grounds for termination based on] . . . failure to rehabilitate, and [the grounds for termination based on] . . . acts of commission or omission (except with respect to Neri [Jasmin], who was not born at the time of the [acts of commission or omission] incidents)." The court further found that termination was in the best interests of the five minor children. Accordingly, the trial court granted the department's petitions. These appeals followed. Additional facts will be set forth as necessary.

I

THE RESPONDENT'S APPEAL

The respondent appeals from the judgment of the trial court terminating her parental rights to the five children. On appeal, she claims that: (1) the trial court improperly found that the department had made reasonable efforts to reunite her with her children; (2) the trial court improperly found that she had failed to rehabilitate herself; and (3) the termination of her parental rights violated her rights under the state and federal constitution.[9]

---

[9] The respondent further claims that the trial court improperly found that the children, other than Neri Jasmin, had been denied the care, guidance or control necessary for each child's physical, educational, moral or emotional well-being by reason of the respondent's acts of commission or omission. Because we conclude that the evidence was sufficient to support the trial court's finding that the respondent had failed to achieve sufficient personal rehabilitation pursuant to § 17a-112 (j) (3) (B) (ii), we do not reach this claim by the respondent. See *In re Eden F.*, 250 Conn. 674, 688, 741 A.2d 873 (1999) ("[d]uring the adjudicatory phase, the trial court must determine whether one or more of the four grounds for termination of parental rights set forth in § 17a-112 [b] exists by clear and convincing evidence").

## A

The respondent first claims that the trial court improperly found that the department had made reasonable efforts to reunify her with her children. More specifically, she asserts that the trial court improperly found that the department had made reasonable efforts to reunify her with her children because the department did not provide the respondent and her children with joint or family therapy. In response, the department asserts that there was sufficient evidence for the trial court to determine that the department had made reasonable efforts to reunify the respondent with her children, and that the department had provided family therapy where appropriate. We agree with the department.

We begin by setting forth the standard of review for this claim. "In order to terminate parental rights under § 17a-112 (j), the department is required to prove, by clear and convincing evidence, that it has made reasonable efforts . . . to reunify the child with the parent, unless the court finds . . . that the parent is unable or unwilling to benefit from reunification . . . . General Statutes § 17a-112 (j) (1). The standard for reviewing reasonable efforts has been well established by the Appellate Court. Turning to the statutory scheme encompassing the termination of the parental rights of a child committed to the department, [§ 17a-112] imposes on the department the duty, inter alia, to make reasonable efforts to reunite the child or children with the parents. The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. Neither the word reasonable nor the word efforts is, however, defined by our legislature or by the federal act from which the requirement was drawn. . . . [R]easonable efforts means doing everything reasonable, not everything possible.

. . . The trial court's determination of this issue will not be overturned on appeal unless, in light of all of the evidence in the record, it is clearly erroneous. . . . *In re Daniel C.*, 63 Conn. App. 339, 361, 776 A.2d 487 (2001)." (Internal quotation marks omitted.) *In re Samantha C.*, 268 Conn. 614, 632, 847 A.2d 883 (2004). "A finding is clearly erroneous when either there is no evidence in the record to support it, or the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . On appeal, our function is to determine whether the trial court's conclusion was factually supported and legally correct. . . . In doing so . . . [g]reat weight is given to the judgment of the trial court because of [the court's] opportunity to observe the parties and the evidence. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling." (Citations omitted; internal quotation marks omitted.) Id., 627–28.

After a careful review of the record, we conclude that there was adequate evidence supporting the trial court's finding that the department had made reasonable efforts to reunify the family. After the four older children were placed in the department's custody in May, 2002, and the youngest child was placed in February, 2003, the department offered to the respondent numerous services and programs to aid in their reunification. The trial court found that these services and programs included: a program for nonoffending partner parenting and understanding sexual abuse issues; substance abuse evaluation and treatment; individual and group therapy; random urine screening; a child parenting program; court-ordered evaluations; family therapy; supervised and unsupervised visitation; transportation for the respondent and the children; assistance in

obtaining appropriate housing; assistance in obtaining appropriate furniture; intensive family reunification services; in-home services; assistance in obtaining resources for employment; an infant outreach program; parental aide services; and administrative and case management services. The department actually attempted reunification by permitting Jaime to live with the respondent beginning in July, 2005. Until January, 2006, the department's plan for the family had been to reunify the respondent and her children. Jaime was chosen to be the first child returned home, with the expectation that the others would follow.

The respondent nevertheless asserts that the department did not make reasonable efforts for reunification because it did not provide group or family therapy for her and the children. The evidence in the record, however, supports the trial court's finding that the department provided group therapy for the respondent and her children, where appropriate. The department provided family therapy for the respondent and Jaime, which began in June, 2005, and continued throughout his reunification with the respondent. The respondent's family therapy with Jaime continued until December, 2005, when Jaime was removed from her care after the attempted reunification failed. In July, 2005, the department began providing family therapy for the respondent and Melinda. This therapy continued until September, 2005. The department also provided family therapy for the respondent and Jenira beginning in August, 2005.

In her brief, the respondent specifically asserts that the department did not make reasonable efforts at reunification because it did not provide family therapy for her and Melody. The evidence in the record, however, belies this claim. Melody received individual therapy and her personal therapist did not recommend joint therapy until the fall of 2005. When the department

scheduled an appointment for Melody and the respondent to begin family therapy at that time, the respondent did not show up for the appointment. Thereafter, Melody began withdrawing from those around her, including her foster mother, therapist and department caseworker. As a result, family therapy with Melody was discontinued.

We conclude that the trial court's finding that the department made reasonable efforts at reunification was not clearly erroneous. Even if the evidence had established that additional family therapy might have been beneficial, such evidence does not render the trial court's finding clearly erroneous. As we previously have noted herein, "[r]easonable efforts means doing everything reasonable, not everything possible." (Internal quotation marks omitted.) *In re Destiny D.*, 86 Conn. App. 77, 82, 859 A.2d 973, cert. denied, 272 Conn. 911, 863 A.2d 702 (2004). The Appellate Court properly has affirmed findings that the department made reasonable efforts for reunification in cases in which the department's efforts were far less comprehensive than those in the present case. See *In re Alexander T.*, 81 Conn. App. 668, 673, 841 A.2d 274 ("[i]n light of the entire record, the failure to provide the referral, while a lapse, does not make the overall efforts of the department fall below the level of what is reasonable"), cert. denied, 268 Conn. 924, 848 A.2d 472 (2004); *In re Ebony H.*, 68 Conn. App. 342, 350, 789 A.2d 1158 (2002) ("[n]otwithstanding the court's finding that the department's response to the [respondent mother's] request for assistance in obtaining housing was shameful and unacceptable, our review of the evidence admitted at the trial does not leave us with a definite and firm conviction that the court mistakenly found that the department had made reasonable efforts to reunify the respondent and the child").

B

The respondent also claims that there was insufficient evidence supporting the trial court's finding that she had failed to achieve sufficient personal rehabilitation pursuant to § 17a-112 (j) (3) (B) (ii). Specifically, the respondent claims that her compliance with the specific steps ordered by the court at the commitment proceedings for the children demonstrates that she achieved sufficient personal rehabilitation to allow her to assume a responsible position in her children's lives. We disagree.

We first turn to the standard of review that governs this claim. "A trial court's finding that a parent has failed to achieve sufficient rehabilitation will not be overturned unless it is clearly erroneous. . . . A finding is clearly erroneous when either there is no evidence in the record to support it, or the reviewing court is left with the definite and firm conviction that a mistake has been made. . . .

"On appeal, our function is to determine whether the trial court's conclusion was factually supported and legally correct. . . . In doing so, however, [g]reat weight is given to the judgment of the trial court because of [the court's] opportunity to observe the parties and the evidence. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling." (Citations omitted; internal quotation marks omitted.) *In re Samantha C.*, supra, 268 Conn. 627–28.

"In order to terminate a parent's parental rights under § 17a-112, the petitioner is required to prove, by clear and convincing evidence, that: (1) the department has made reasonable efforts to reunify the family; General Statutes § 17a-112 (j) (1); (2) termination is in the best

interest of the child; General Statutes § 17a-112 (j) (2); and (3) there exists any one of the seven grounds for termination delineated in § 17a-112 (j) (3)." *In re Samantha C.*, supra, 268 Conn. 628.

In the present case, the department alleged in its petition that the respondent had failed to achieve sufficient rehabilitation pursuant to § 17a-112 (j) (3) (B) (ii). That statute provides for the termination of a child where the child "is found to be neglected or uncared for and has been in the custody of the commissioner for at least fifteen months and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ." General Statutes § 17a-112 (j) (3) (B) (ii).

We previously have concluded that, "[p]ersonal rehabilitation . . . refers to the restoration of a parent to his or her former constructive and useful role as a parent . . . [and] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . The statute does not require [a parent] to prove precisely when she will be able to assume a responsible position in her child's life. Nor does it require her to prove that she will be able to assume full responsibility for her child, unaided by available support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation she has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date she can assume a responsible position in her child's life."

(Citations omitted; internal quotation marks omitted.) *In re Eden F.*, 250 Conn. 674, 706, 741 A.2d 873 (1999).

Our careful review of the record in the present case reveals that the evidence credited by the trial court adequately supported its finding that the respondent had failed to achieve sufficient rehabilitation. First, contrary to the respondent's allegations, the evidence supports the trial court's finding that the plaintiff had not complied with all of the specific steps ordered by the court. Specifically, the trial court found that although the respondent did participate in individual therapy, she had failed to make progress toward the identified treatment goals. The trial court's finding was based on a report by the respondent's therapist in December, 2005, that the respondent "continued to use poor judgment and her disorganization was troubling." The therapist further reported that the respondent would not be able to keep the younger children safe while Marcus was in the home because of his aggressiveness and bullying. The trial court further concluded that the respondent did not demonstrate that she had complied with the requirement to "[s]ecure and/or maintain adequate housing and legal income" because the evidence at trial demonstrated that she had not obtained full-time employment sufficient to support the children if they were returned to her. She had exhausted her benefits from the department of social services and could not show how she would be able to support herself and the children. The trial court further found that the respondent did not comply with the substance abuse testing requirements and the requirement that she not engage in substance abuse. These findings are supported by the evidence in the record.

"In determining whether a parent has achieved sufficient personal rehabilitation, a court may consider whether the parent has corrected the factors that led to the initial commitment, regardless of whether those

factors were included in specific expectations ordered by the court or imposed by the department. . . . Accordingly, successful completion of expressly articulated expectations is not sufficient to defeat a department claim that the parent has not achieved sufficient rehabilitation." (Citations omitted.) *In re Vincent D.*, 65 Conn. App. 658, 670, 783 A.2d 534 (2001).

In the present case, the trial court found that because the respondent "did not actually acknowledge and accept her personal responsibility to prevent such horrific sexual acts committed by her boyfriend against [her] children, [she] has been unable to take the steps necessary for her rehabilitation to the point where she could be viewed as a viable resource for the protection and safety of her children, and thus as a viable parenting resource with whom the children could again reside permanently." The evidence presented at trial supports this finding.

The department presented testimony from Kelly Rogers, a licensed psychologist. Rogers had conducted five evaluations of the respondent and the minor children from March, 2003, through May, 2006. Rogers testified that the respondent's personality was that of "an individual with very limited frustration tolerance, prone to be impulsive, especially in an emotional sense, having propensity to develop dependent relationships that may alternate with long periods of . . . solitude and isolation." Rogers further testified that "while [the respondent] had been through a great deal of treatment and is able to articulate an understanding of the difficulties in her family system previously . . . she doesn't address behavioral disturbances on the part of the children in a productive way and that, in my opinion, she is likely to have further impulsive responses to bad behavior from her children; that she may use excessive force or that she may respond in other exaggerated ways that are not productive; that, while there was little

indication that she is presently in a romantic relationship, that there exists a significant potential for her becoming involved in further dependent relationships . . . in which she may become involved in . . . an abusive type relationship and expose the children to that kind of dynamic; [and] that as a product of what I've characterized as her limited insight, that she will tend to fail to recognize, ignore or minimize mental health concerns on the part of her children that will lead to inadequate treatment of them."

In addition, in the report of the May, 2006 psychological evaluation completed by Rogers, which was introduced at trial, Rogers concluded that, "[w]hile [the respondent] demonstrates the intellect and understanding necessary to effect productive changes, it is evident that she continues to demonstrate inadequate or inappropriate parenting when given the opportunity to have the children in her care. Such failures are evident despite more than adequate services and an appropriate level of participation in such services. . . . [T]here is little to suggest that the [respondent] will productively improve to the degree that she would consistently parent any of her children in a safe and psychologically healthy manner consistent with their best interests. . . . While she gives the appearance of adequate education in parenting skills, has the intellect to make reasonable decisions regarding their welfare, and has sufficient understanding for self-management, [the respondent] continues to accept little responsibility for the children's maltreatment—at her hands and at the hands of her former partner. Whatever insight she has gained through education and treatment has not translated to consistency in responsible parenting, and the children are in need of permanency now."

The trial court credited Rogers' testimony and report, the accuracy of which was confirmed by what transpired after Marcus and Jaime were returned to the

respondent's care in 2005. The respondent then displayed an inability to make appropriate decisions for the care of her children, a lack of candor with the department and other service providers, and a failure to follow through on department directives designed to ensure the safety of the children. The department substantiated two incidents of physical abuse of Marcus by the respondent. In addition, the respondent allowed Marcus' health insurance to lapse and failed to obtain his anti-seizure medication from the pharmacy, resulting in him suffering an epileptic seizure. A teacher from Jaime's Head Start program also testified that the respondent failed to respond to concerns about Jaime that were raised by teachers at the program while he was in the respondent's care. Both the respondent and her therapist testified at trial that the respondent had failed to disclose these incidents to the department or the therapist.

Although the record reveals that the respondent was attached to her children, visited with them regularly, and attempted to, and did comply, with several specific steps, it also supports the trial court's finding that she had not accepted responsibility for the earlier mistreatment of the children and had not rehabilitated adequately so as to be able to parent them safely. We therefore conclude that there was sufficient evidence in the record supporting the trial court's finding that the respondent had not achieved a sufficient level of personal rehabilitation after almost four years to encourage the belief that she could parent her children safely.

C

The respondent also claims that the trial court's termination of her parental rights violated her rights under

the federal and state constitutions.[10] Although the respondent failed to raise her constitutional claims before the trial court, we acknowledge that a party may prevail on unpreserved constitutional claims pursuant to *State* v. *Golding,* 213 Conn. 233, 239–40, 567 A.2d 823 (1989). It is well established, however, that parties affirmatively seek to prevail under *Golding,* and bear the burden of establishing that they are entitled to appellate review of their unpreserved constitutional claims. *State* v. *Commins,* 276 Conn. 503, 514–15, 886 A.2d 824 (2005). In the present case, however, the respondent does not seek a review under *Golding.* Her brief makes no mention of, or request for *Golding* review. Consequently, we decline to review the respondent's constitutional claims. *Ghant* v. *Commissioner of Correction,* 255 Conn. 1, 17, 761 A.2d 740 (2000) ("[i]t is not appropriate to engage in a level of review that is not requested" [internal quotation marks omitted]). Moreover, the respondent has inadequately briefed her constitutional claim, which is alleged to be an equal protection claim. She addresses the claim in only one and one-half pages of her brief, without any analysis or explanation. We therefore could not address this claim even if *Golding* review had been sought. See, e.g., *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control,* 266 Conn. 108, 120, 830 A.2d 1121 (2003) ("We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief

---

[10] The respondent invokes both the federal and state constitutions in support of her claim. She has failed, however, to provide us with an independent analysis of her claim under the state constitution. "We have repeatedly apprised litigants that we will not entertain a state constitutional claim unless the defendant has provided an independent analysis under the particular provisions of the state constitution at issue." (Internal quotation marks omitted.) *State* v. *Canales,* 281 Conn. 572, 592 n.12, 916 A.2d 767 (2007).

the issue properly . . . ." [Internal quotation marks omitted.]).

## II

### THE CHILDREN'S APPEAL FROM THE TERMINATION OF PARENTAL RIGHTS

We next turn to the appeal brought by Melody, Jenira, Jaime and Neri Jasmin (children)[11] challenging the judgments of the trial court terminating the parental rights of the respondent. On appeal, the children claim that the trial court improperly: (1) admitted expert opinion testimony by Rogers; and (2) concluded that termination of the parental rights of the respondent was in the best interests of Melody and Jaime.[12] Neri Jasmin also claims that the termination of the respondent's parental rights without a jury trial violated her rights under our state constitution.

### A

Our appellate courts have not had the opportunity to determine specifically whether a child may properly appeal from the termination of the parental rights of his or her parent. Accordingly, the threshold issue in the children's appeal is whether the children have standing to bring this appeal.

We begin, therefore, with our well settled principles dictating the nature of that inquiry. "The issue of stand-

---

[11] See footnote 3 of this opinion.

[12] The children also claim that there was insufficient evidence to support the trial court's findings that the respondent had failed to achieve sufficient personal rehabilitation pursuant to § 17a-112 (j) (3) (B) (ii) and that Melody, Melinda, Jenira and Jaime had been denied the care, guidance or control necessary for each child's physical, educational, moral or emotional well-being by reason of the respondent's acts of commission or omission. Because these two claims are identical to claims made by the respondent in her appeal, our consideration and resolution of the respondent's claims in part I of this opinion are dispositive of the children's identical claims. It would serve no useful purpose to repeat our discussion or analysis here.

ing implicates this court's subject matter jurisdiction. . . . Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he [or she] has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy. . . . When standing is put in issue, the question is whether the person whose standing is challenged is a proper party to request an adjudication of the issue . . . . Standing requires no more than a colorable claim of injury; a [party] ordinarily establishes . . . standing by allegations of injury. Similarly, standing exists to attempt to vindicate arguably protected interests. . . .

"Standing is established by showing that the party claiming it is authorized by statute to bring an action, in other words statutorily aggrieved, or is classically aggrieved. . . . The fundamental test for determining [classical] aggrievement encompasses a well-settled twofold determination: [F]irst, the party claiming aggrievement must successfully demonstrate a specific, personal and legal interest in [the challenged action], as distinguished from a general interest, such as is the concern of all members of the community as a whole. Second, the party claiming aggrievement must successfully establish that this specific personal and legal interest has been specially and injuriously affected by the [challenged action]. . . . Aggrievement is established if there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected." (Citations omitted; internal quotation marks omitted.) *Eder Bros., Inc.* v. *Wine Merchants of Connecticut, Inc.*, 275 Conn. 363, 368–70, 880 A.2d 138 (2005).

Although this court has not had the opportunity to decide whether a child may bring an appeal from the termination of the rights of his or her parent, we

addressed a similar issue in *In re Christina, M.*, 280 Conn. 474, 486–87, 908 A.2d 1073 (2006). The issue in that case was "whether parents who are respondents to a termination of parental rights petition have standing to assert the constitutional rights of their children who are the subject of the termination action." Id., 476. We concluded that parents can assert the constitutional rights of their children because "the rights of the [parents] are inextricably intertwined with those of their children." Id., 487. In doing so, we relied on *Wright* v. *Alexandria Division of Social Services*, 16 Va. App. 821, 433 S.E.2d 500 (1993), cert. denied, 513 U.S. 1050, 115 S. Ct. 651, 130 L. Ed. 2d 555 (1994). In that case, the Virginia Court of Appeals, concluded that "[i]n cases involving parental rights, the rights of the child coexist and are intertwined with those of the parent. The legal disposition of the parent's rights with respect to the child necessarily affects and alters the rights of the child with respect to his or her parent. [The child] ha[d] a 'personal stake in the outcome' of the proceeding to terminate her mother's parental rights and, therefore, ha[d] standing to challenge the propriety of the trial judge's decision to terminate those rights." Id., 825.

We find this reasoning to be even more persuasive and directly applicable in the present case, for the issue in *Wright*, as in the present case, was whether the child had standing to appeal from the termination of her mother's parental rights. The rights of the children here are inextricably intertwined with those of the respondent. As we recognized in *In re Christina M.*, supra, 280 Conn. 485, "both the [parents] and the children have a mutual interest in the preservation of family integrity, and the termination of parental status is irretrievably destructive of that most fundamental family relationship." Accordingly, we conclude that the children have established standing to appeal from the judgments terminating the parental rights of the respondent.

## B

On appeal, the children first claim that the trial court improperly admitted and relied on expert opinion testimony from Rogers. Specifically, the children claim that Rogers lacked the requisite expertise with sexual abuse to testify as an expert in the present case and that his testimony was based on insufficient information about the parties involved. In addition, the children also assert that the trial court improperly allowed Rogers to testify as to the ultimate issue in the case. In response, the department claims that the trial court properly admitted testimony from Rogers and did not abuse its discretion in relying on his testimony.

We first set forth the applicable standard of review. "The applicable standard of review for evidentiary challenges is well established. Unless an evidentiary ruling involves a clear misconception of the law, the [t]rial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling . . . ." (Internal quotation marks omitted.) *State* v. *Grant*, 286 Conn. 499, 532, 944 A.2d 947 (2008).

In the present case, Rogers had conducted five evaluations of the respondent and the children from March, 2003, through May, 2006. At the time the commissioner petitioned for termination of the respondent's parental rights, the parties agreed that Rogers would conduct another evaluation and answer a series of questions, including, inter alia, "[c]onsidering the age and needs of the children . . . whether the [respondent] can achieve such a degree of personal rehabilitation as would encourage the belief that, within a reasonable

period of time, [she] could resume a responsible position in the [lives] of the child[ren]."

At trial, the department introduced testimony from Rogers and sought to qualify him as an expert in the areas of clinical psychology, court-ordered evaluations in Juvenile Court and sexual abuse trauma. The respondent and the children objected to Rogers' qualification as an expert in the area of sexual abuse trauma, but did not object to his qualification as an expert in the other two areas. Indeed, the children's attorney acknowledged that Rogers, "obviously, has good qualifications as a clinical psychologist and as a court-ordered evaluator . . . ." Thereafter, the trial court qualified Rogers as an expert in the areas of clinical psychology and court-ordered evaluations in Juvenile Court and denied without prejudice the department's motion to qualify him in the area of sexual abuse trauma, indicating that the parties might not "get to any issue involving expertise in that area."

Rogers thereafter testified as to the results of his evaluation, including his opinion that the respondent had not rehabilitated herself sufficiently to be able to assume a responsible position in the lives of the children. In its memorandum of decision, the trial court credited Rogers' testimony and his report of the May, 2006 evaluation, which was also admitted into evidence, wherein he concluded that the respondent had failed to achieve sufficient personal rehabilitation.

On appeal, the children first claim that the trial court's admission of testimony and documentary evidence from Rogers was improper because he was not qualified as an expert in sexual abuse trauma and did not spend an adequate amount of time with the family. We disagree. As we explained previously herein, Rogers was appointed by the court to conduct evaluations of the family on five separate occasions during the relevant

time period. In this capacity, Rogers met with the respondent and each of the children on numerous occasions. In this capacity, Rogers' role was to assess the psychological functioning of the respondent and the children and to answer several questions posed by the court. The undisputed evidence demonstrates that Rogers had conducted approximately 1000 court-ordered evaluations of families in Juvenile Court and had extensive experience in the field of clinical psychology. Throughout this time, the respondent and the children never asserted that Rogers was not qualified or was not adequately conducting these evaluations. To the contrary, Rogers' continuing appointment was by the agreement of the parties.

At trial, the court acted consistent with the children's objection and did not qualify Rogers as an expert in the field of sexual abuse trauma. The children do not point to, and we cannot find, any instance in which Rogers' testified as to issues specifically related to sexual abuse. Instead, Rogers testified as to the findings of his evaluations, an area in which the court had properly recognized him as an expert without objection from the respondent or the children.

The children further claim that the trial court improperly allowed Rogers to testify as to the ultimate issue in the case, namely, whether the respondent had achieved sufficient personal rehabilitation or if more time or services would allow her to assume a responsible position in the lives of the children if they were to return home. The children claim that such expert testimony was improper because it called for legal conclusions and was not necessary to help or to inform the court. In response, the department asserts that Rogers' testimony as to the ultimate issue in the case was consistent with § 7-3 (a) of the Connecticut Code of Evidence and common practice in Juvenile Court proceedings. Furthermore, the department also asserts that, in the

present case, all of the parties, including the children's attorney, agreed that a court-appointed evaluator was needed in this case to assist the court in making determinations about the family. We agree with the department.

This court repeatedly has held that, "[e]xperts can . . . sometimes give an opinion on an ultimate issue where the trier, in order to make intelligent findings, needs expert assistance on the precise question on which it must pass." (Internal quotation marks omitted.) *State* v. *Vilalastra*, 207 Conn. 35, 41, 540 A.2d 42 (1988), cert. denied, 349 U.S. 926, 75 S. Ct. 775, 99 L. Ed. 1257 (1955). This understanding has been codified in § 7-3 (a) of the Connecticut Code of Evidence, which provides in relevant part that "[t]estimony in the form of an opinion is inadmissible if it embraces an ultimate issue to be decided by the trier of fact, except that . . . an expert witness may give an opinion that embraces an ultimate issue where the trier of fact needs expert assistance in deciding the issue."

As the Appellate Court aptly has recognized, "[t]he trial court's exercise of discretion in admitting expert testimony is not to be disturbed unless it has been abused or the error is clear and involves a misconception of the law. . . . Furthermore, [c]ourts are entitled to give great weight to professionals in parental termination cases." (Citation omitted; internal quotation marks omitted.) *In re Tabitha P.*, 39 Conn. App. 353, 364–65 n.8, 664 A.2d 1168 (1995); id. (concluding that trial court had not abused its discretion in admitting into evidence testimony of court-appointed evaluator's conclusions where there was no evidence that court failed to consider any other evidence in rendering its decision).

In the present case, the parties agreed in the order for evaluation that Rogers should evaluate and make a finding as to whether the respondent had achieved sufficient personal rehabilitation, presumably because

such information would be useful to the court in making its decision on the termination petition. Moreover, the memorandum of decision demonstrates that the trial court considered other evidence as well, but ultimately concluded that the respondent had failed to achieve sufficient rehabilitation, based in part on her difficulty in reunification with Marcus and her failed attempt at reunification with Jaime in 2005. Accordingly, we conclude that the trial court did not abuse its discretion in admitting Rogers' testimony regarding whether the respondent had achieved sufficient personal rehabilitation.

C

The children also claim that the trial court improperly determined that the termination of the parental rights of the respondent was in the best interests of Melody and Jaime.[13] Specifically, the children assert that the trial court ignored substantial evidence that Melody and Jaime were bonded with the respondent and that the termination of the respondent's parental rights would be detrimental to them.[14] In response, the department

[13] Although Jenira and Neri Jasmin stipulated to and joined the brief of Melody and Jaime, that brief asserts only that the trial court improperly determined that the termination of the respondent's parental rights was in the best interests of Melody and Jaime; it does not address the best interests of Jenira or Neri Jasmin. Moreover, in her brief, Neri Jasmin asserted that if the adjudicatory determinations of the trial court were affirmed, the termination of the respondent's parental rights was in the best interests of Neri Jasmin. We therefore do not address whether the trial court properly determined that termination was in the best interests of Jenira or Neri Jasmin.

[14] The children also claim that the trial court improperly failed to consider and make the requisite findings as to Melody and Jaime's wishes. In its memorandum of decision, the trial court did make the requisite findings regarding Melody and Jaime's wishes, a fact that the children seem to acknowledge in their briefs. We therefore interpret the children's argument to be that the trial court should have given Melody and Jaime's wishes more weight in its determination. We disagree with that claim. Accordingly, we conclude that the trial court properly considered the wishes of Melody and Jaime.

asserts that the trial court's determination that the termination of the respondent's parental rights was in the best interests of Melody and Jaime is supported by the record and was not clearly erroneous. We agree with the department.

We first set forth the applicable standard of review. "The legal framework for deciding termination petitions is well established. [A] hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the . . . grounds for termination of parental rights set forth in § 17a-112 [(j) (3)] exists by clear and convincing evidence. . . . If the trial court determines that a statutory ground for termination exists, then it proceeds to the dispositional phase. During the dispositional phase, the trial court must determine whether termination is in the best interests of the child. . . . The best interest determination also must be supported by clear and convincing evidence." (Citations omitted; internal quotation marks omitted.) *In re Davonta V.*, 285 Conn. 483, 487–88, 940 A.2d 733 (2008).

"It is axiomatic that a trial court's factual findings are accorded great deference. Accordingly, an appellate tribunal will not disturb a trial court's finding that termination of parental rights is in a child's best interest unless that finding is clearly erroneous. . . . A finding is clearly erroneous when either there is no evidence in the record to support it, or the reviewing court is left with the definite and firm conviction that a mistake has been made. . . .

"On appeal, our function is to determine whether the trial court's conclusion was factually supported and legally correct. . . . In doing so, however, [g]reat weight is given to the judgment of the trial court because of [the court's] opportunity to observe the parties and

the evidence. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling." (Citation omitted; internal quotation marks omitted.) Id., 488.

The children assert that the trial court improperly found that the termination of the parental rights of the respondent was in the best interests of Melody and Jaime because the evidence established that those children shared a bond with the respondent. "Our courts consistently have held that even when there is a finding of a bond between parent and a child, it still may be in the child's best interest to terminate parental rights." *In re Rachel J.*, 97 Conn. App. 748, 761, 905 A.2d 1271, cert. denied, 280 Conn. 941, 912 A.2d 476 (2006); see also *In re Tyqwane V.*, 85 Conn. App. 528, 536, 857 A.2d 963 (2004) ("The Appellate Court has concluded that a termination of parental rights is appropriate in circumstances where the children are bonded with their parent if it is in the best interest of the child to do so. . . . This is such a case." [Internal quotation marks omitted.]); *In re Ashley S.*, 61 Conn. App. 658, 667, 769 A.2d 718 ("[A] parent's love and biological connection . . . is simply not enough. [The department] has demonstrated by clear and convincing evidence that [the respondent] cannot be a competent parent to these children because she cannot provide them a nurturing, safe and structured environment."), cert. denied, 255 Conn. 950, 769 A.2d 61 (2001). In the present case, on the basis of our careful review of the record, we conclude that the trial court's finding that termination of the respondent's parental rights was in the best interests of Melody and Jaime was not clearly erroneous.

At trial, the department introduced an evaluation report prepared by Rogers in May, 2006. In this report, Rogers stated that Melody did not display evidence of

an ongoing parent-child relationship with the respondent, but had "positive sentiments regarding [the respondent] . . . as a component of their ongoing visitation . . . ." Rogers also pointed out that "[t]he long period outside [the respondent's] care [approximately four years] has effectively precluded an ongoing parent/child relation for Melody . . . ." Moreover, Rogers further opined that Melody did not see the respondent as her psychological parent.

The evidence further established that Melody, who had been the victim of substantial sexual abuse by the respondent's boyfriend, had negative feelings toward the respondent and that she was afraid of returning to the respondent's custody. Melody's foster mother testified at trial that Melody had told her on several occasions that "she's afraid of going with [the respondent] because she's afraid that whatever happened to her before, if [the respondent] did not believe her, what makes her think [the respondent] will believe her now. And also that [the respondent] had moved from [the home she shared with the boyfriend] but only two blocks away." The testimony at trial also demonstrated that Melody still remained fearful that the boyfriend would return, and began screaming and crying on at least one occasion when she saw a man who resembled him. The foster mother further testified that Melody did not ask for the respondent or talk about her between visits.

The trial court also relied on Rogers' report of his consultation with Ellen Pharr, the coordinator of the safe home program in which Melody had recently stayed before being placed in a foster home and who served as Melody's individual therapist. Pharr reported that Melody shared little about her biological family and spoke of missing her previous foster mother, but made no mention of the respondent. Pharr also reported that she "never had the impression that [Melody] had a

strong bond" with the respondent and had never heard Melody speak about wanting to return to live with the respondent. Pharr indicated that although Melody initially had been eager to attend family visits, her enthusiasm for such visits waned when Marcus and Melinda stopped attending. On the basis of this evidence, we cannot conclude that the trial court's determination that the termination of the parental rights of the respondent was in Melody's best interests was clearly erroneous.

In his May, 2006 report, which was introduced as a full exhibit at trial, Rogers opined that Jaime also did not display evidence of an ongoing parent-child relationship with the respondent, but had "positive sentiments regarding [the respondent] . . . as a component of their ongoing visitation . . . ." Moreover, Rogers further indicated that "Jaime's age, placement apart from [the respondent] and limited contact with her do not support an ongoing mother/son relation." Rogers also reported that "Jaime did not convincingly articulate his allegiances, but his emotional connection to [the respondent] was not compelling."

Moreover, the evidence at trial demonstrated that when Jaime was returned to the respondent's care for several months in 2005, the respondent became overwhelmed, physically abused her older child Marcus and left Jaime in Marcus' supervision against the department's clear instructions, refused to comply with the department's request for drug testing, stopped seeing her psychiatrist and stopped taking her prescription medications. As a result, the department had to halt Jaime's reunification with the respondent and remove him from her care once again. Accordingly, on the basis of all this evidence, we cannot conclude that the trial court's determination that termination of the parental rights of the respondent was in the best interests of Jaime was clearly erroneous.

D

Neri Jasmin claims on appeal that the termination of the respondent's parental rights without a jury trial violated the state constitutional rights of both the respondent and Neri Jasmin. The state correctly points out, and Neri Jasmin seems to concede in her brief, that she failed to raise her constitutional claim in the trial court.

As we acknowledged previously herein, a party may prevail on an unpreserved constitutional claim pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40, "if the party affirmatively requests and adequately briefs [her] entitlement to *Golding* review." *Lebron* v. *Commissioner of Correction*, 274 Conn. 507, 532, 876 A.2d 1178 (2005); see also *State* v. *Waz*, 240 Conn. 365, 371 n.11, 692 A.2d 1217 (1997) (party "who seek[s] consideration of unpreserved constitutional claims [on appeal] . . . bear[s] the burden of establishing their entitlement to such review under the guidelines enumerated in *Golding*").

In the present case, Neri Jasmin claims that her constitutional claim is subject to *Golding* review, but fails in her brief to provide any analysis of her claim under the four-pronged *Golding* test. To the contrary, Neri Jasmin merely asserts in one sentence that her claim is subject to *Golding* review without providing any analysis of the four prongs. See *Lebron* v. *Commissioner of Correction*, supra, 274 Conn. 532. We conclude therefore, that Neri Jasmin has failed to establish her entitlement to *Golding* review of her constitutional claim.

Moreover, we note that Neri Jasmin has failed to provide an independent analysis of her state constitutional claim under *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992). "We have repeatedly apprised litigants that we will not entertain a state constitutional claim unless the defendant has provided an independent

analysis under the particular provisions of the state constitution at issue. . . . Without a separately briefed and analyzed state constitutional claim, we deem abandoned the defendant's claim." (Internal quotation marks omitted.) *State* v. *Randolph*, 284 Conn. 328, 375 n.12, 933 A.2d 1158 (2007). Accordingly, we decline to review Neri Jasmin's state constitutional claim.

## III

### THE CHILDREN'S APPEAL FROM THE DENIAL OF THE MOTION FOR VISITATION

The children also appeal from the trial court's order denying their motion for visitation with the respondent pending these appeals. The children contend that the trial court improperly concluded that there were constitutional implications to the children's motion for visitation and failed to apply properly the best interests of the child standard in denying the children's motion. The department responds that the trial court properly denied the motion for visitation because it properly determined that such visitation was not in the best interests of the children. Furthermore, at oral argument in this court, the department asserted that this appeal would be rendered moot if this court were to affirm the trial court's termination of the respondent's parental rights because the children were seeking visitation only during the pendency of these appeals. We agree with the department that the outcome of the other appeals renders this appeal moot, and, accordingly, we dismiss this appeal as moot.

The following additional facts and procedural history are relevant to our resolution of this appeal. After the trial court rendered the judgments terminating the parental rights of the respondent, the respondent and the children filed notices of appeal. Shortly thereafter, the children filed two motions with the trial court. In one motion, the children moved to continue regular

visits with the respondent pursuant to General Statutes §§ 17a-10a[15] and 46b-59,[16] pending the disposition of the appeals. In the other motion, the children moved to stay the execution of the court's order terminating the parental rights of the respondent and to continue visitation pursuant to Practice Book § 61-12,[17] pending the

[15] General Statutes § 17a-10a provides in relevant part: "(a) The Commissioner of Children and Families shall ensure that a child placed in the care and custody of the commissioner pursuant to an order of temporary custody or an order of commitment is provided visitation with such child's parents and siblings, unless otherwise ordered by the court.

"(b) The commissioner shall ensure that such child's visits with his or her parents shall occur as frequently as reasonably possible, based upon consideration of the best interests of the child, including the age and developmental level of the child, and shall be sufficient in number and duration to ensure continuation of the relationship. . . .

"(d) The commissioner shall include in each child's plan of treatment information relating to the factors considered in making visitation determinations pursuant to this section. If the commissioner determines that such visits are not in the best interests of the child or that the number, frequency or duration of the visits requested by the child's attorney or guardian ad litem is not in the best interests of the child, the commissioner shall include the reasons for such determination in the child's plan of treatment."

[16] General Statutes § 46b-59 provides: "The Superior Court may grant the right of visitation with respect to any minor child or children to any person, upon an application of such person. Such order shall be according to the court's best judgment upon the facts of the case and subject to such conditions and limitations as it deems equitable, provided the grant of such visitation rights shall not be contingent upon any order of financial support by the court. In making, modifying or terminating such an order, the court shall be guided by the best interest of the child, giving consideration to the wishes of such child if he is of sufficient age and capable of forming an intelligent opinion. Visitation rights granted in accordance with this section shall not be deemed to have created parental rights in the person or persons to whom such visitation rights are granted. The grant of such visitation rights shall not prevent any court of competent jurisdiction from thereafter acting upon the custody of such child, the parental rights with respect to such child or the adoption of such child and any such court may include in its decree an order terminating such visitation rights."

[17] Practice Book § 61-12 provides: "In noncriminal matters in which the automatic stay provisions of Section 61-11 are not applicable and in which there are no statutory stay provisions, any motion for a stay of the judgment or order of the superior court pending appeal shall be made to the judge who tried the case unless that judge is unavailable, in which case the motion may be made to any judge of the superior court. Such a motion may also

outcome of the appeals. After a hearing, the trial court denied both motions. Thereafter, the children filed a notice of appeal from the order of the trial court denying both motions. The children also filed a motion for review of the trial court's order denying their motion for a stay. The Appellate Court thereafter granted the children's motion for review, but denied the relief requested therein.

Because mootness implicates the subject matter jurisdiction of this court, we first address whether our resolution of the other appeals relating to the merits of the termination of the parental rights of the respondent renders this appeal moot. "Mootness is a question of justiciability that must be determined as a threshold matter because it implicates [this] court's subject matter jurisdiction . . . . We begin with the four part test for justiciability established in *State* v. *Nardini*, 187 Conn. 109, 445 A.2d 304 (1982). . . . Because courts are established to resolve actual controversies, before a claimed controversy is entitled to a resolution on the merits it must be justiciable. Justiciability requires (1) that there be an actual controversy between or among the parties to the dispute . . . (2) that the interests of the parties be adverse . . . (3) that the matter in controversy be capable of being adjudicated by judicial power . . . and (4) that the determination of the controversy will result in practical relief to the complain-

be filed before judgment and may be ruled upon at the time judgment is rendered unless the court concludes that a further hearing or consideration of such motion is necessary. A temporary stay may be ordered sua sponte or on written or oral motion, ex parte or otherwise, pending the filing or consideration of a motion for stay pending appeal. The motion shall be considered on an expedited basis and the granting of a stay of an order for the payment of money may be conditional on the posting of suitable security.

"In the absence of a motion filed under this section, the trial court may order, sua sponte, that proceedings to enforce or carry out the judgment or order be stayed until the time to take an appeal has expired or, if an appeal has been filed, until the final determination of the cause. A party may file a motion to terminate such a stay pursuant to Section 61-11."

ant." (Citation omitted; internal quotation marks omitted.) *State* v. *Preston*, 286 Conn. 367, 373–74, 944 A.2d 276 (2008).

"[A]n actual controversy must exist not only at the time the appeal is taken, but also throughout the pendency of the appeal. . . . When, during the pendency of an appeal, events have occurred that preclude an appellate court from granting any practical relief through its disposition of the merits, a case has become moot." (Internal quotation marks omitted.) Id., 374.

In the present case, the children appeal from the trial court's order denying their motion to continue visitation with the respondent pending the appeals from the termination of the respondent's parental rights. We have now concluded that the trial court's judgments terminating those rights should be affirmed. These appeals therefore are at an end and we can grant no practical relief to the children in their appeal from the denial of visitation. In their motion, the children sought continued visitation while the two appeals were pending. Our resolution of those appeals, therefore, makes it impossible to grant the children the relief they sought.

We recognize that "an otherwise moot question may qualify for review under the capable of repetition, yet evading review exception [to the mootness doctrine]. To do so, however, it must meet three requirements. First, the challenged action, or the effect of the challenged action, by its very nature must be of a limited duration so that there is a strong likelihood that the substantial majority of cases raising a question about its validity will become moot before appellate litigation can be concluded. Second, there must be a reasonable likelihood that the question presented in the pending case will arise again in the future, and that it will affect either the same complaining party or a reasonably identifiable group for whom that party can be said to act

as surrogate. Third, the question must have some public importance. Unless all three requirements are met, the appeal must be dismissed as moot. . . . The basis for the first requirement derives from the nature of the exception. If an action or its effects is not of inherently limited duration, the action can be reviewed the next time it arises, when it will present an ongoing live controversy. Moreover, if the question presented is not strongly likely to become moot in the substantial majority of cases in which it arises, the urgency of deciding the pending case is significantly reduced. Thus, there is no reason to reach out to decide the issue as between parties who, by hypothesis, no longer have any present interest in the outcome." (Citation omitted; internal quotation marks omitted.) *State* v. *Boyle*, 287 Conn. 478, 487 n.3, 949 A.2d 460 (2008).

In the present case, we acknowledge that it is possible for an appeal from a motion for continued visitation pending appeal to be decided along with any appeals from the termination judgment in the majority of cases. We are, however, unpersuaded that this possibility makes it likely that "the substantial majority of cases" raising a question about continued visitation pending appeal will evade review. *Sweeney* v. *Sweeney*, 271 Conn. 193, 201–202, 856 A.2d 997 (2004). To the contrary, as the children did in this appeal, any child seeking continued visitation pending appeal may seek a motion for stay of the termination pursuant to Practice Book § 61-12. If the motion is denied, a child may seek to have that denial reviewed by filing a motion for review pursuant to Practice Book § 66-6,[18] as the children did

---

[18] Practice Book § 66-6 provides in relevant part: "The court may, on written motion for review stating the grounds for the relief sought, modify or vacate any order made by the trial court under Section 66-1 (a); any action by the appellate clerk under Section 66-1 (c) (2); any order made by the trial court, or by the workers' compensation commissioner in cases arising under General Statutes § 31-290a (b), relating to the perfecting of the record for an appeal or the procedure of prosecuting or defending against an appeal; any order made by the trial court concerning a stay of execution

in this case. Indeed, it appears that the children's appeal from their motion for continued visitation pending appeal is merely an attempt for further review of the same issues decided in the motion for review. Because there is another, more appropriate, avenue for reaching the issue presented by their appeal—namely, a motion to stay—the issue can be reviewed the next time it is presented and is, therefore, not of limited duration. We conclude, therefore, that the children's appeal does not satisfy the first prong of the capable of repetition, yet evading review doctrine. See, e.g., *In re Amy H.*, 56 Conn. App. 55, 61, 742 A.2d 372 (1999) (declining to review challenge to visitation order because respondent parent did not move for stay of execution); *In re Clifton B.*, 15 Conn. App. 367, 368 n.1, 544 A.2d 666 (1988) (declining to review whether parents had rights to continued visitation where respondents did not file motion for review of denial of motion for stay and continued visitation). We therefore conclude that the children's appeal from the trial court's denial of their motion for visitation is moot and, accordingly, we dismiss this appeal.

The judgments of the trial court terminating the parental rights of the respondent as to the children are affirmed; the appeal from the order of the trial court denying the children's motion for visitation is dismissed as moot.

In this opinion ROGERS, C. J., and NORCOTT and ZARELLA, Js., concurred.

---

in a case on appeal; any order made by the trial court concerning the waiver of fees, costs and security under Section 63-6 or 63-7; or any order concerning the withdrawal of appointed appellate counsel pursuant to Section 62-9 (d). Motions for review shall be filed within ten days from the issuance of notice of the order sought to be reviewed. Motions for review of the clerk's taxation of costs under judgments of the court having appellate jurisdiction shall be governed by Section 71-3. . . ."

SCHALLER, J., concurring. The tragic family situation portrayed in these pages presents us with the case of a mother who, after an initial period of serious neglect of her children, has redeemed herself through her dedicated efforts to regain her role as a parent. The respondent mother, according to the reliable, well-informed testimony of many witnesses, has complied with each one of the specific steps required by the state despite the inconsistent and, at times, inadequate support of the department of children and families (department). The respondent ended her relationship with the children's abuser and rejected any other harmful relationships, acknowledged her responsibility for her past mistakes, became and remained substance free, participated fully in therapy, obtained an education, gained employment, secured a dwelling for herself and the children, and overcame all obstacles to maintaining close contact with her children. It is difficult to imagine how any person in this situation could do more toward the goal of being reunited with her children. Her efforts have been so fruitful that the testimony of all but one medical professional witness urged that termination of her parental rights was not in the children's best interests. That one witness, Kelly Rogers, the court-appointed evaluator on whom the trial court relied almost exclusively in its decision, had minimal contact with the respondent during a period of four years—a mere four sessions encompassing a mere ten hours. In an almost unprecedented development, all five children, whose relationship with their mother was terminated by the court against their wishes, have joined in appealing the termination.[1] The guardian ad litem for the children, Susanne McNamara, strongly supported the respondent's position—and the children's best interests—in her extensive trial testimony.

---

[1] One of the children, Melinda, has withdrawn from the children's appeals. See footnote 3 of the majority opinion. The other children are Melody, Jenira, Jaime and Neri Jasmin.

Although I agree with the conclusion of the majority opinion that, under the current standard of review of a trial court's termination of parental rights, we are bound to affirm the judgment of the trial court, I write separately to emphasize that these three appeals demonstrate emphatically that a more rigorous appellate review of the record is essential in appeals challenging the termination of parental rights.

I emphasize specifically that the trial court in the present case did not give appropriate weight to the highly reliable evidence in the record that unmistakably supported the claims of the children and the respondent in opposition to the termination of the respondent's parental rights. The trial court granted the petition for termination of the respondent's parental rights filed by the petitioner, the commissioner of children and families, on the basis of its determinations that the department had proved by clear and convincing evidence that: (1) it had made reasonable efforts toward reunification, and the respondent was unable or unwilling to benefit from reunification efforts;[2] see General Statutes § 17a-112 (j) (1); (2) the respondent had failed sufficiently to rehabilitate herself; see General Statutes § 17a-112 (j) (3) (B) (ii); (3) the respondent had denied

[2] General Statutes § 17a-112 (j) requires the department to make a three-pronged showing in a petition for termination of parental rights. See footnote 7 of the majority opinion. Each prong must be established by clear and convincing evidence. In the first prong, the department must show that it made reasonable efforts to locate the parent and reunify the child with the parent. If the department can show by clear and convincing evidence that the parent is unable or unwilling to benefit from reunification efforts, however, it need not establish that it made reasonable efforts toward reunification. See General Statutes § 17a-112 (j) (1). In the present case, although either finding would have been sufficient to resolve this prong, the trial court found that the department had made reasonable efforts, and also determined that the respondent was unable or unwilling to benefit from reunification efforts. Because either of these determinations would support the trial court's judgment, I address both in considering the first prong of the three-pronged showing required by the department.

each child, with the exception of Neri Jasmin, by reason of an act or acts of commission or omission, the care, guidance or control necessary for his or her physical, educational or emotional well-being;[3] see General Statutes § 17a-112 (j) (3) (C); and (4) termination of the respondent's parental rights was in the best interest of each child. See General Statutes § 17a-112 (j) (2). A scrupulous review of the record casts great doubt on the trial court's conclusions that the department satisfied its burden of showing that it made reasonable efforts to reunify the children, and that the respondent was unable or unwilling to benefit from the offers of and provision of services to the point where she could be considered to be a parental resource for reunification. Although those conclusions would suffice to call the trial court's judgment into question, and it is unnecessary for me to reach the issue of whether there is substantial evidence in the record to support the court's conclusion that termination was in the best interests of the children, I reach that issue, and conclude that the record does not support the court's conclusion, to demonstrate further that a scrupulous review of the record would yield a different result in the present appeal.

Ordinarily, the factual findings of the trial court are subject to clearly erroneous review. *State* v. *Mullins*, 288 Conn. 345, 358, 952 A.2d 784 (2008). When, however, "the factual findings implicate a defendant's constitutional rights and the credibility of witnesses is not the primary issue, we will . . . undertake a scrupulous examination of the record to ensure that the findings

---

[3] Because I conclude that, upon a scrupulous review of the record, the trial court's conclusions regarding the reasonableness of the department's efforts at reunification and the best interests of the children are not supported by substantial evidence in the record, it is unnecessary to address the issue of whether the trial court's conclusions that the statutory grounds set forth in § 17a-112 (j) (3) (B) (ii) and (C) were so supported.

are supported by substantial evidence."[4] Id. Under this level of review, the trial court's judgment will stand unless that judgment is clearly erroneous—the only difference is that in making that determination, we undertake a "scrupulous review" of the record, a level of factual review that we currently do not employ in termination cases. We have applied this heightened level of review of the factual record in cases involving: a criminal defendant's right to due process; see, e.g., *State* v. *Lawrence*, 282 Conn. 141, 154, 920 A.2d 236 (2007) (scrupulous examination of record to determine whether defendant's confession was voluntary); *State* v. *Colon*, 272 Conn. 106, 335, 864 A.2d 666 (2004) (scrupulous examination of record in reviewing finding of aggravating factor); equal protection; see, e.g., *State* v. *Ellis*, 232 Conn. 691, 700–701, 657 A.2d 1099 (1995) (scrupulous examination of record in reviewing trial court's finding that jury panel was selected randomly); a criminal defendant's fifth amendment rights; see, e.g., *State* v. *Jones*, 281 Conn. 613, 654–55, 916 A.2d 17 (scrupulous examination of record to determine whether waiver of fifth amendment rights was valid), cert. denied, 552 U.S. 868, 128 S. Ct. 164, 169 L. Ed. 2d 112 (2007); *State* v. *Atkinson*, 235 Conn. 748, 759–60, 670 A.2d 276 (1996) (scrupulous examination of record to determine whether defendant was in custody for purpose of fifth amendment *Miranda* warnings[5]); fourth amendment rights; see, e.g., *State* v. *Damon*, 214 Conn. 146, 154–55, 570 A.2d 700 (scrupulous examination of record to determine whether defendant's fourth amendment protections were implicated by police interrogation), cert. denied, 498 U.S. 819, 111 S. Ct. 65, 112 L. Ed. 2d 40 (1990); and eighth amendment rights. See, e.g., *State* v. *Webb*, 252 Conn. 128, 138, 750 A.2d 448

[4] The credibility of the witnesses was not the primary issue in the present case.

[5] See *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

(scrupulous examination of record to review trial court's determination that lethal injection is not cruel and unusual punishment), cert. denied, 531 U.S. 835, 121 S. Ct. 93, 148 L. Ed. 2d 53 (2000).[6]

Although the present case is not a criminal matter, of course, it is unquestionable that termination of a parent's rights implicates a fundamental liberty interest—the right to raise one's children—that is accorded a unique position in our society. The United States Supreme Court has stated that it is "perhaps the oldest of the fundamental liberty interests recognized by this [c]ourt." *Troxel* v. *Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). "The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition." *Wisconsin* v. *Yoder*, 406 U.S. 205, 232, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972). In fact, to say that the present case *implicates* the fundamental right to raise one's children is a vast understatement. "A termination of parental rights is both total and irrevocable. Unlike other custody proceedings, it leaves the parent with no right to visit or communicate with the child." (Internal quotation marks omitted.) *M.L.B.* v. *S.L.J.*, 519 U.S. 102, 118, 117 S. Ct. 555, 136 L. Ed. 2d 473 (1996), quoting *Lassiter* v. *Dept. of Social Services*, 452 U.S. 18, 39, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981) (Blackmun, J., dissenting). "Few forms of

---

[6] See also *Kelo* v. *New London*, 268 Conn. 1, 150, 843 A.2d 500 (2004) (*Zarella, J.*, concurring and dissenting) (eminent domain case stating that "[i]n light of the constitutional interests at stake . . . the issue of whether the properties actually will be used for a public purpose is an ultimate issue that should be reviewed by this court on the basis of its own scrupulous examination of the record . . . [which] is necessary to ensure that judicial review comports with constitutional standards of due process" [citation omitted; internal quotation marks omitted]), aff'd, 545 U.S. 469, 125 S. Ct. 2655, 162 L. Ed. 2d 439 (2005).

state action are both so severe and so irreversible." *Santosky* v. *Kramer*, 455 U.S. 745, 759, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). The interest of the parent in "the accuracy and justice of the decision . . . is, therefore, a commanding one." (Internal quotation marks omitted.) Id. Accordingly, the court has held that due process requires that, "[b]efore a [s]tate may sever completely and irrevocably the rights of parents in their natural child, due process requires that the [s]tate support its allegations by at least clear and convincing evidence." Id., 747–48.

In arriving at its conclusion that, at a minimum, the state must prove its case in support of termination by clear and convincing evidence, the court employed the due process balancing test set forth in *Mathews* v. *Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). For the same reasons that the court concluded that due process requires the clear and convincing standard as the minimum burden of persuasion borne by the state, I believe that due process also requires that a reviewing court examine the record scrupulously to determine whether the trial court's termination of parental rights is supported by substantial evidence. Specifically, in *Mathews*, the court stated that the "identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Id. No one disputes that the private interest at stake in termination cases is a fundamental right protected by both the federal and state constitutions. See, e.g., *Troxel*

v. *Granville*, supra, 530 U.S. 65; *Dutkiewicz* v. *Dutkie-wicz*, 289 Conn. 362, 372–73, 957 A.2d 821 (2008); *Roth* v. *Weston*, 259 Conn. 202, 218, 789 A.2d 431 (2002). In sweeping language that has direct application to the case at hand, the court in *Santosky* described the significant risk of erroneous deprivation in a termination proceeding: "At such a proceeding, numerous factors combine to magnify the risk of erroneous factfinding. Permanent neglect proceedings employ imprecise substantive standards that leave determinations unusually open to the subjective values of the judge. . . . In appraising the nature and quality of a complex series of encounters among the agency, the parents, and the child, the court possesses unusual discretion to underweigh probative facts that might favor the parent. Because parents subject to termination proceedings are often poor, uneducated, or members of minority groups . . . such proceedings are often vulnerable to judgments based on cultural or class bias.

"The [s]tate's ability to assemble its case almost inevitably dwarfs the parents' ability to mount a defense. No predetermined limits restrict the sums an agency may spend in prosecuting a given termination proceeding. The [s]tate's attorney usually will be expert on the issues contested and the procedures employed at the factfinding hearing, and enjoys full access to all public records concerning the family. The [s]tate may call on experts in family relations, psychology, and medicine to bolster its case. Furthermore, the primary witnesses at the hearing will be the agency's own professional caseworkers whom the [s]tate has empowered both to investigate the family situation and to testify against the parents. Indeed, because the child is already in agency custody, the [s]tate even has the power to shape the historical events that form the basis for termination." (Citations omitted.) *Santosky* v. *Kramer*, supra, 455 U.S. 762–63.

The present case exemplifies precisely the type of problems envisioned in *Santosky*. The state, through its action and its inaction, shaped the course of the termination proceedings. In the state's determined efforts to pursue termination, the realities of the complex factual situation became obscured in an overly simplistic view of the family relationships involved. As a result, the respondent's extraordinarily successful efforts to recover from a difficult situation were too readily dismissed. The fact that the testimony of a court-appointed evaluator with disturbingly limited contacts with the family, rather than a state's witness, had unusual and inappropriate impact on the court's decision making, should not insulate the factual record from our penetrating review.

The addition of the due process safeguard that I propose in this concurrence is, I submit, one of great benefit—namely, a decreased likelihood of an unjust termination of parental rights. Moreover, according the level of factual review that I propose would not subject the trial court's determinations to more than clearly erroneous review; it would merely require the reviewing court, in applying clearly erroneous review to the judgment of the trial court, to scrutinize the factual record as closely as it would when dealing with the deprivation of liberty that is at issue in criminal cases. The deprivation of liberty and the far-reaching consequences of a parental termination are surely no less important than many of the criminal proceedings that are given scrupulous review. The government's interest in safeguarding children would not be affected adversely by a more exacting review of the record, because such a review must be conducted solely for the purpose of ascertaining whether there was substantial evidence to support the trial court's determination. This case illustrates that the government's interest in safeguarding children would, in fact, be strengthened. This balance is appro-

priate given the unique nature of the fundamental right to raise one's children, and given *Santosky's* recognition that the interest at stake in parental rights termination cases is "far more precious than any property right." Id., 758–59.

The present case illustrates clearly the need for a more exacting review of the factual record in termination cases. To illustrate, I examine each of the following in turn to determine whether the trial court's conclusion that the department met its burden of establishing each requirement by clear and convincing evidence was supported by substantial evidence: (1) the department made reasonable efforts toward reunification; (2) the respondent was unable or unwilling to benefit from further reunification efforts; and (3) termination of the respondent's parental rights is in the best interest of each child. As to each, I conclude that there is not substantial evidence in the record to support the trial court's conclusion.

In arriving at its conclusion that the department had made reasonable efforts toward reunification, the trial court relied on evidence of the services provided to the respondent. The court listed those services as including: the nonoffending partner parenting program, substance abuse evaluation and treatment, individual and group therapy, random urine screenings, child parenting program, court-ordered evaluations, family therapy, supervised and unsupervised visitation, transportation for the respondent and her children, assistance in obtaining appropriate housing, assistance in obtaining furniture, intensive family reunification services, in-home services, assistance in obtaining resources for employment, infant outreach program, parent aide services, and administrative and case management services.

Although the department did provide many services to the respondent, the question, in determining whether

the department made reasonable efforts, is whether the department did *everything* reasonable toward reunification—not necessarily everything *possible*, but at the very least everything reasonable. See *In re Daniel C.,* 63 Conn. App. 339, 361, 776 A.2d 487 (2001). My review of the record reveals that the department failed in three major areas to make reasonable efforts toward reunification: family therapy, visitation, and the first reunification attempt.

Denise Stone, the respondent's therapist, testified that family therapy was essential to the reunification process. She testified that family therapy would allow the therapist to observe the family functioning as a unit and address any issues that arose in that context. It also would have allowed the children a forum to present the respondent with their concerns about the respondent's failure to protect them from abuse, and would have allowed the therapist to observe how she responded to those difficult questions. It would have allowed the children an opportunity to process the abuse with the respondent in a safe environment and receive reassurances that she would be able to protect them in the future. McNamara, the children's guardian ad litem, also testified that the amount of family therapy provided to the family, a service that the experts agreed was essential as part of a reunification plan, was minimal and did not demonstrate a commitment to reunification on the part of the department. She testified specifically regarding Melody's need for family therapy, a service that had not been provided on any consistent and significant basis by the department, and expressed the view that such therapy would have been essential to assist Melody to work through the trauma of the sexual abuse.

Even Rogers, a clinical psychologist and the court-appointed evaluator in the present case, strongly recommended in his first evaluation that family therapy would

be the "ideal" way to address the sexual abuse that the children had suffered, and the resulting erosion of their sense of security in the home and trust in the respondent. He reiterated that recommendation several times, in very strong terms: "Family therapy must be instituted and at least four sessions . . . are necessary before reunification is *considered*." (Emphasis added.) In his second evaluation report, Rogers stated that family therapy for about six months to prepare the family for reunification would be reasonable. Such therapy, according to Rogers, would "form an evaluative context to drive the decision whether or not to reunify." According to Rogers, open communication between the family therapist and all the individual therapists would be required in order for the process to be effective.[7] Given the recommendations of Stone and Rogers, and McNamara's opinion of the importance of providing family therapy on a consistent basis, it is not even a close call to say that the provision of family therapy to this family by the department would have been reasonable, and, therefore, that the department should have, as part of its reasonable efforts toward reunification, provided family therapy.

Despite the fact that both Stone and Rogers informed the department that family therapy was an essential component of reunification, the department provided no more than minimal family therapy to the family. Stone testified that she had spoken to Denita Weber, a social worker assigned to the case, several times about beginning family therapy with the respondent and the children. Weber responded initially that Melody's individual therapist had indicated that Melody was not ready for family therapy at that time. The department gave no reason for the failure to supply family therapy for the younger children at the outset. Eventually, family

---

[7] In his final evaluation, in light of his recommendation in support of termination of parental rights, Rogers did not recommend family therapy.

therapy was provided for Marcus, Melinda and Jenira, but the girls' sessions did not even begin until 2005, three years after the children had been removed from the home, and the sessions stopped soon after they began. Melody appears to have had one family therapy session with the respondent. After the respondent missed one family therapy session with Melody, the sessions were terminated and were not resumed.

Stone and Rogers also both advocated increased visitation between the respondent and the children. Rogers recommended a progressive increase in visitation, from supervised to unsupervised, and in increasing time increments, eventually to include weekend visits, in order to prepare the children for reunification. Stone testified that increased visitation would have assisted in fostering the parent-child relationship. Given this information, it is without question that it would have been reasonable for the department progressively to increase visitation between the respondent and her children.

When Stone requested increased visitation between the respondent and the children, however, Weber claimed that it would take too much time to schedule the visits and that no one was available to provide transportation. Eventually, in 2005, during the attempted reunification with Marcus and Jaime, the respondent had some unsupervised visitation with Melinda, Jenira and Neri Jasmin, but the frequency of that visitation and the duration of the visits is not clear from the record. McNamara noted specifically in her assessment of the best interests of the children that the department had made only a minimal attempt to implement a progression of visitation—either by increasing the frequency and duration of the visits or by allowing some unsupervised visitation—despite an obvious need for it, and despite the respondent's

extraordinary commitment to adhere to the existing visitation schedule.

There is also evidence in the record that the department prematurely abandoned its first attempt at reunification with Marcus and Jaime. Marcus was returned to the respondent in April, 2005. The department transported Marcus back and forth to his individual therapy throughout the attempted reunification. Several issues and concerns arose during the reunification process. The respondent had difficulty controlling Marcus' behavior and on two occasions hit him. Weber testified that Marcus missed some therapy sessions when he refused to get into the medical cab that came to the house to transport him to therapy. He also refused to take his anti-seizure medication and eventually had a seizure. He missed several medical appointments and the respondent allowed his medical coverage to lapse. The respondent doubtless exercised poor judgment at times, including one occasion when she allowed Marcus to be alone with Jaime during the summer, playing football outside while she was sleeping inside the house. Additionally, Melinda told Weber that, during an unsupervised visit, the girls were left alone with Marcus, who tormented the family cat in the girls' presence.

Several professional service providers testified, however, that all of these issues could and should have been dealt with by assisting the respondent without removing Marcus and Jaime from the home. Patricia Valle, a social worker employed by the Village for Families and Children, worked in the intensive family preservation program (program), which provides services to families in which the department has indicated that the children are at risk of removal. Valle worked with the respondent from March, 2005, through October, 2005, during the attempted reunification with Marcus and Jaime and was aware of the ongoing issues. At the beginning of the first unit of service, which was dedi-

cated to reunifying the respondent and Marcus, the department and the program identified three goals for the respondent and Marcus: (1) reunification of the respondent with Marcus; (2) the respondent's provision of a safe and appropriate environment for Marcus; and (3) Marcus' compliance with the respondent's house rules. As of June 10, 2005, service with regard to Marcus was terminated because the program determined that the respondent had completed the goals successfully. Valle testified that the respondent had made improvements during the course of the first unit of service in providing structure and discipline for Marcus. Valle worked with the respondent on setting limits for Marcus and establishing clear expectations for him. According to Valle, the respondent greatly improved in her parenting skills and did not hesitate to contact Valle any time that she needed support and guidance. At the close of the first unit of service, Valle recommended that the department continue to support and assist the family toward reunification. At that time, the program opened a second unit of service to reunify the respondent with Jaime. Similar goals were identified for this second unit: reunification, strengthening of parenting skills and provision of a safe and appropriate home environment for Jaime. Valle testified that, in the beginning of his placement with the respondent, Jaime had some delays in his speech. The respondent worked with providers and physicians, who advised her as to how to assist Jaime in improving his speech. Consistent with that advice, she obtained educational toys and worked with Jaime. By the end of the placement, there was a noticeable improvement in his speech development. Valle also testified that the respondent continued to make use of her services, seeking her assistance in being consistent and improving her coping skills. When questioned as to whether she had any concerns about the home environment, Valle responded: "No. [The respondent] main-

tained a good home, a clean home. She was also going to school at the time, and she had found employment during the second unit of services, and she still maintained a good home, and also, the boys helped out. The boys were now—especially, Marcus was now actively involved. I would come, and I would see the two oldest boys do chores in the kitchen, and they were all functioning well within the home, and it was kept well." The program terminated the second unit of services because the respondent successfully completed the identified goals. Valle, who was aware of the issues that subsequently occasioned the removal of Marcus and Jaime from the home, once again recommended that the department follow through and continue to assist the respondent in working toward reunification. When questioned regarding the respondent's level of commitment to her children, Valle responded that she was "very committed to her children." She elaborated: "She was trying to improve their life, and she was trying to make sure that she provided the safety that she stated that she was not able to provide . . . prior . . . to her children being removed from her care."

Stone testified that when Jaime and Marcus initially were returned to the home, the respondent "struggled" and was "overwhelmed" at having responsibility for an "active toddler" and a teenager with behavioral problems. The respondent, however, eventually was able to overcome that anxiety and stress, in part because she actively sought out the support and advice of her therapist, the pastor at her church, and other professionals who were available as part of her support network. The respondent also took the initiative to seek out additional parenting courses offered by the Village for Families and Children.

McNamara testified that she had not been notified that Jaime had been reunified with the respondent, and found out about his removal only afterward. In her

opinion, the department unnecessarily and prematurely removed Jaime on the basis of issues that could have been addressed while Jaime remained with the respondent. Given the opinions of Valle, Stone and McNamara, I conclude that it would have been reasonable for the department to address the issues that the respondent was having during this first attempted reunification while the children remained in the home with her, rather than abandoning the effort entirely.

That the department could have dealt with the concerns that arose during the first attempted reunification while Jaime and Marcus remained in the home with the respondent is further borne out by the success of the second reunification between Marcus and the respondent. Connie Carter, a family support team clinician employed by Catholic Charities, offered testimony regarding the second reunification between Marcus and the respondent. The family support team (team), which provides intensive in-home services to families, was assigned to assist the respondent during the second reunification attempt. The services were ongoing at the time of trial. At the beginning of the provision of services, the team set goals for the respondent, including establishing appropriate roles, rules and boundaries, creating positive communication, encouraging Marcus to participate in after school activities, and setting consequences for him. Carter testified that both the respondent and Marcus had made progress in attaining those goals, and that the respondent was trying to implement the goals, was willing to discuss issues and welcomed input from the team. She also testified that she was very impressed with the respondent's ability to follow the team's recommendations and "go with it." For example, the respondent had implemented a rewards program that the team had suggested for Marcus, rewarding him for good behavior at home and in school. The respondent consistently applied the plan, and Mar-

cus was responding by improving his behavior. As compared to other parents in similar situations, the respondent, according to Carter, had a much higher frustration threshold, and was much more willing to accept suggestions and implement them. When Carter observed the respondent and Marcus together, the respondent's behavior was appropriate and affectionate. Finally, Carter testified that the team's services would be available to assist the respondent, given a referral from the department, in achieving reunification with the remaining children.

The department's failure to provide family therapy and to both increase and progress visitation, contrary to the strong recommendations of both Stone and Rogers, coupled with the department's premature abandonment of the attempted reunification, despite the opinions of Stone, Valle and McNamara that the problems during that reunification could have been addressed without removing the children from the home, leads me to conclude that substantial evidence is lacking in the record for the trial court's conclusion that the department established by clear and convincing evidence that it made reasonable efforts toward reunification. The trial court's conclusion is further called into question by the testimony of McNamara, the guardian ad litem for the children, that family therapy, progressively increased visitation, and a more committed attempt at reunifying Marcus and Jaime, would have been in the best interests of the children. In light of this scrupulous review of the record, I would conclude that the trial court's termination of the respondent's parental rights was clearly erroneous.

I next turn to the question of whether the department established by clear and convincing evidence that the respondent would have been unable to benefit from further services. In concluding that further services would not benefit the respondent, the court gave unjust-

ifiably great weight to the testimony of Rogers, the court-appointed evaluator, who conducted a mere four evaluations in this case, spending a total of only ten hours with the respondent over the course of four years, and who testified that the respondent had never accepted responsibility for the sexual and physical abuse suffered by the children.[8] Specifically, Rogers testified that, at different times during the course of the court-ordered evaluations, the respondent had claimed that Melody had not told her of the sexual abuse, had stated that although she may have been "partly to blame for not seeing [the abuse]," she "did not do anything *directly* to [her] children"; (emphasis added); and had stated that her addiction to heroin had prevented her from realizing that her boyfriend was sexually abusing the children. Rogers stated that in his opinion, the respondent had "minimize[d]" the sexual abuse and had tried to relegate it to the back of her mind. In the fourth and final evaluation, Rogers stated that, in his opinion, "[the respondent] continues to accept little responsibility for the children's mistreatment—at her hands and at the hands of her former partner . . . ." The court also relied on Rogers' statement, in an addendum to his second evaluation, that Stone had told him that the respondent "steadfastly maintained in therapy that Melody never made any disclosure to [the respondent] prior to removal . . . ."

Rogers' testimony regarding the respondent's pattern of becoming involved in abusive relationships illustrates why both he and the court linked the respondent's alleged failure to accept responsibility with a supposed inability to benefit from further services. Although Rog-

[8] Over the course of those four years, Rogers spent a total of two hours with Melody, two and one-half to three hours with Melinda, one and one-half hours each with Jenira and Jaime, and no time with Neri Jasmin. In fact, Rogers repeatedly confused Melody and Melinda in writing his evaluation reports, even his final report, and corrected some of the errors in handwriting.

ers admitted that there was no evidence whatsoever that the respondent was currently involved in any relationship, he expressed reservations regarding the respondent's ability to avoid becoming involved in an abusive relationship in the future, a development that would jeopardize the well-being of the children. In addition to that speculation, he further testified that, given the respondent's failure to "show much positive response" from past reunification efforts, it was his opinion that the respondent would tend not to benefit from further reunification efforts. When asked what he meant by stating that the respondent did not show a positive response, he stated that the respondent continued to minimize her role in the abuse and failed to accept responsibility for that role. In other words, Rogers speculated that, because of her alleged failure to accept responsibility, the respondent could allow the same thing to happen again.

The court also indicated in its memorandum of decision that McNamara's testimony supported the conclusion that the respondent never swayed from her initial failure to acknowledge the abuse and accept responsibility for her role in it. Specifically, the trial court stated that McNamara testified that "[the respondent] has continued to use the excuse of 'I was blinded by my excessive substance abuse' through the present to excuse her from having or taking responsibility for the sexual abuse of her children, her failure or unwillingness to protect them, and the consequences thereof." Relying primarily on the testimony of Rogers, but also in part on what it asserted was McNamara's testimony and Rogers' testimony of a hearsay statement by Stone, the court concluded that the respondent had failed to acknowledge the sexual abuse to which her children had been subjected and failed to accept responsibility for her role in permitting that abuse to occur. The court considered its conclusion that the respondent never

accepted responsibility for her role in the sexual abuse as essential to its further conclusion that the respondent had been unable to rehabilitate sufficiently and benefit from further services, stating: "Because [the respondent] has not been able to acknowledge and accept that she was personally responsible for what happened to and that she failed to protect such children, [the respondent] has been unable to take the steps necessary for her rehabilitation to the point where she could be viewed as a viable resource for the protection and safety of her children, and thus as a viable parenting resource with whom the children could again reside permanently."

Contrary to the trial court's statements concerning McNamara's testimony in the memorandum of decision, McNamara's testimony does not at all support the conclusion that the respondent failed to acknowledge and accept responsibility for the sexual abuse suffered by her children. McNamara specifically testified that one of the respondent's great strengths as a parent was her willingness to learn and change in order to be reunified with her children. She also testified that the respondent openly had acknowledged to McNamara her role in and responsibility for the sexual abuse suffered by her children. McNamara testified that she was "quite confident" that the respondent had accepted responsibility for her part in the abuse. This testimony cannot be reconciled with the trial court's characterization of McNamara's opinion on the issue of whether the respondent accepted responsibility.[9]

In addition to misstating McNamara's testimony, the trial court gave no credence at all to the testimony of

[9] Ironically, although the trial court did not consider the respondent's acknowledgment of responsibility valid for purposes of determining whether she had accepted responsibility, it considered those same admissions as evidence in support of its finding that the respondent denied the children, by means of acts of omission or commission, of the care, guidance or control necessary for their physical, educational, moral or emotional well-being. See General Statutes § 17a-112 (j) (3) (C).

the mental health care professional who was in the best position to give an opinion regarding the extent and sincerity of the respondent's acceptance of responsibility—Stone, the respondent's therapist. Instead, the court chose to accept Rogers' testimony regarding an alleged hearsay statement made to him by Stone, that the respondent had evaded responsibility for her role in the abuse by maintaining that Melody was lying in reporting that she had told the respondent about the abuse. The court only briefly acknowledged the fact that Stone's testimony supported exactly the opposite conclusion, and dismissed it immediately because, in the court's opinion, Stone, and all of the other mental health providers who concluded that the respondent had accepted responsibility for her actions, failed to realize that the respondent's ultimate acceptance of responsibility was negated by the fact that she ultimately admitted that her addiction to heroin prevented her from being able to protect her children.[10]

Stone's testimony strongly supported the conclusion that the respondent eventually came to acknowledge the abuse and accepted responsibility for her failure to protect her children against their abuser. Stone began

---

[10] The trial court characterized the respondent's understanding of the role that her substance abuse played in her failure to protect her children as an "excuse" and as yet another attempt to avoid responsibility. First, I note that, although the respondent initially denied it, she eventually admitted that she was addicted to heroin. It is not a stretch of credulity to believe that such an addiction would prevent her from being capable of caring for her children and protecting them from her abusive boyfriend. Second, I struggle to comprehend how one can understand, in the context of a proceeding for the termination of parental rights, that failing to prevent the sexual abuse of one's children due to an addiction to heroin is somehow an "excuse." The mere fact that the respondent provided a very credible explanation of how her failure came about does not in any way change the fact that she admitted that she had failed to protect her children. In fact, if the respondent's substance abuse contributed to her inability to protect her children, not only is it not an "excuse" for her to accept that connection—it is an essential step in her rehabilitation as a parent.

to provide treatment for the respondent in May, 2003, and had continued to treat her until shortly prior to trial, meeting with the respondent on a weekly basis for most of those three and one-half years. The context of Stone's initial contact with the respondent is also significant; the respondent participated in a program for nonoffending parents of children who were abused and was referred to Stone by the leader of that program when she sought additional services. Stone was in a significantly better position than Rogers, therefore, accurately to assess the respondent's progress in acknowledging that the sexual abuse had occurred and accepting responsibility for her role in allowing it to happen. She testified that the respondent had made significant progress in therapy, progress comparable to parents who had achieved reunification with their children. She stated that it took some time before the respondent trusted her enough to be able to be honest, in the context of their sessions, about "what had led . . . to her children being sexually abused." In the first six months of therapy, the respondent struggled with accepting the fact that her children had been sexually abused. Eventually, however, after the respondent was provided access to the children's forensic interviews, she gradually moved from acknowledgment that the abuse had occurred to acceptance of her responsibility for not protecting her children from that abuse. Part of that process involved coming to terms with the role that her substance abuse had played in her failure to protect her children from their abuser. Stone also testified that the respondent made significant progress during therapy in understanding the role that domestic violence had played in her past relationships and working toward not repeating the patterns that had led her to seek out abusive partners. For example, Stone testified that the respondent had built considerable support networks for herself, particularly in her church and with the Village for Families and Children.

That the trial court only briefly references Stone's testimony, relying instead on a hearsay statement reported by Rogers that is completely at odds with Stone's direct testimony during trial, and mischaracterizes McNamara's testimony, aptly demonstrates that a scrupulous review of the record in this case and other termination cases is absolutely essential. The true picture of the respondent that emerges from the testimony of these two well-informed witnesses stands in sharp contrast to the image accepted by the trial court as established by clear and convincing evidence, and supported only by the testimony of Rogers on the basis of his limited contacts. What is most concerning is that Rogers' portrayal of the respondent is not consistent with the opinions of all the mental health care professionals who observed the respondent's parenting skills after the respondent had made a truly extraordinary effort at transforming herself into a better parent for the sake of her children. For example, Valle's testimony indicated that she had complete confidence in the respondent's ability to parent her children safely. Carter, who was still providing in-home services to the respondent at the time of trial, also testified strongly regarding the respondent's progress, her willingness to accept suggestions and implement recommendations, her ability to cope with frustration and her commitment to becoming a better parent.

The testimony of two additional mental health care providers who observed the respondent's parenting skills in dealing with Marcus is also significant. Peter McGreen, a clinical psychologist at Riverview Hospital (hospital), testified regarding his interaction with the respondent while Marcus was committed to the care of the hospital from March, 2006, to July, 2006. He testified that he "found [the respondent] to be cordial, respectful, interested in what [he] had to say, and very interested in working with the staff at the hospital

towards making good interventions with Marcus." He testified further that the respondent was very responsive to the interventions, universally following through on McGreen's suggestions and assisting by setting goals for Marcus, encouraging him to be cooperative, and giving Marcus feedback regarding his behavior. McGreen observed that Marcus was more cooperative when the respondent suggested behavior than when the same suggestions came from staff. He testified that the respondent was extremely reliable and always on time for visits, despite the fact that it was extremely difficult for her to get there, taking two, sometimes three, buses over a course of two hours in order to get to the hospital. Although other parents in similar situations in the past had become frustrated and had ceased coming, the respondent persisted. He testified that her commitment to Marcus was outstanding, and that she had been excellent to work with, doing whatever was asked of her and following through consistently. When questioned regarding how he found the respondent to be coping with the stress of assisting with Marcus' treatment, and juggling all of her other responsibilities, including studying for exams, McGreen stated that he found the respondent to be a very calm and even person, who neither overreacted nor underreacted to stress in her life. On the basis of his interaction with her and observations of her, he stated that he found the respondent to be a very strong parent. He even went so far as to say: "[I]f I had to give her a grade, it would be A+ as a parent, and compared to the other parents that I've dealt with over two decades . . . . she really was outstanding."

Also testifying regarding Marcus' stay at the hospital was Joan Narad, a child and adolescent psychiatrist and the associate medical director at the hospital. She also worked as the unit psychiatrist for Marcus' unit in the hospital. She, too, testified regarding the respon-

dent's frequent visitation, and stated that the respondent was cooperative and eager to learn what would be most helpful to her son. She stated that she observed the respondent during visitation to parent effectively, following the direction of staff to set limits with him, and being very reliable. Narad noted that the respondent encouraged Marcus' academic interests, and functioned as an "effective member" of the team. She further testified that the respondent had a "deep commitment" to Marcus and that she was willing to go to great lengths to be his parent. Despite the stressful circumstances under which the respondent lived, Narad noted that the respondent functioned "quite well." When asked how she would describe the respondent as a parent, Narad stated that she believed that the respondent was "a parent who has learned a lot and has matured. . . . She's willing to take in information. She is willing to get help . . . ."

Another aspect of the record that does not support the trial court's conclusion is the respondent's compliance with the specific steps ordered by the court. The respondent complied with all of the specific steps ordered by the court, with the exception of the step that required her to submit to substance abuse assessment. I first note that this step was not ordered as a final specific step in the order dated September 8, 2003. Moreover, as I explain in footnote 11 of this concurring opinion, the department conceded that the respondent maintained sobriety for the two years prior to trial. The remaining specific steps required the respondent to: keep all appointments set by or with the department; keep the department informed of her own whereabouts and that of the children; participate in counseling and make progress toward identified treatment goals; accept and cooperate with in-home support services referred by the department; cooperate with court-ordered evaluations and testing; obtain and cooperate

with restraining/protective orders and safety plans to avoid domestic violence; sign releases; secure and maintain adequate housing and legal income; refrain from substance abuse; refrain from any involvement with the criminal justice system; inform the department of household changes; cooperate with the children's therapy; and visit the children as often as the department permitted.

Because the trial court found that the respondent complied with most of the specific steps, I address only those steps that the court concluded that the respondent did not meet or only partially met. The court concluded that the respondent participated in individual therapy, but noted that Stone expressed concern regarding the respondent's progress on two occasions. Considering the whole of Stone's testimony at trial, which unequivocally supports the conclusion that the respondent made significant progress toward identified treatment goals, two isolated expressions of concern do not justify the determination that the respondent failed to comply with this specific step. The court also concluded that the respondent did not fully cooperate with Rogers in the testing process, citing to the fourth evaluation report, but it is unclear on what the trial court based this conclusion. The court also noted that the department did not ask the respondent to seek a restraining order against the boyfriend, yet faulted the respondent for failing to do so. Regarding the requirement that the respondent maintain adequate housing and legal income, the trial court faulted the respondent for failing to complete the nursing program, which she began in September, 2006, by the time of trial, which began in November, 2006, and for failing to find full time employment while enrolled in school. The court also concluded, despite the department's concession to the contrary, and despite the lack of any evidence that the respondent was engaged in substance abuse, that

the respondent failed to comply with the specific step requiring her to cease substance abuse. As for the requirement that the respondent comply with the children's therapy, the court's finding that the respondent missed many scheduled family therapy sessions with Melody is completely at odds with the record. Weber did not remember how many therapy sessions with Melody had been planned, but she recalled that the respondent missed one therapy session with Melody and that the sessions were thereafter terminated. The court concluded that the respondent complied with all of the remaining specific steps.

The respondent went well beyond the specific steps ordered by the court. The testimony of the mental health care professionals, along with the testimony of McNamara and Stone, is consistent with the exceptional effort that the respondent made to obtain services to become a better parent for her children. The sheer list of services she sought out and participated in is, to say the least, *impressive*. Beginning in July, 2002, she participated in a mother/infant outreach program, which lasted until January, 2003. In August, 2002, the respondent was given the specific steps ordered by the court. The day after she was given the specific steps, the respondent contacted Kyle Klecak, the social worker assigned to the case at that time, in order to begin participating in any available services. That same month, the respondent was evaluated for substance abuse. Because she tested positive for heroin and marijuana, the respondent participated in treatment with a relapse prevention group and individual therapy at the Institute for Hispanic Families.[11] She also participated in a parenting program at the Institute for Hispanic

---

[11] Although it is troubling that the respondent refused to submit to alcohol and drug testing in December, 2005, and January, 2006, the trial court noted that the department conceded that the respondent had maintained sobriety for two years.

Families in November, 2002. During the parenting program, the respondent was randomly tested for drugs and alcohol and tested negative. Also in November, 2002, with the assistance of the department, she obtained an apartment and a rent subsidy, and eventually procured a five bedroom home. In February, 2003, the respondent began participating in the nonoffending parent group through which the respondent met Stone, who subsequently provided the respondent with individual therapy that was ongoing at the time of trial. In January, 2003, the respondent was working with the department of labor in trying to find employment, and completed computer training as part of that employment effort. During this time, the respondent attended weekly visitation with her children, and missed only one visit during the entire time that the visitation continued—the day after the boyfriend came to her house, struck her and stole her van. In October, 2006, the respondent completed a program offered by the Village for Families and Children, commonsense parenting. From April, 2005, through September, 2005, she participated in the intensive family preservation program through the Village for Families and Children. Beginning in August, 2006, and continuing through trial, she utilized the services of the Catholic Charities family support team. In September, 2006, after taking classes at Capitol Community College while she was awaiting acceptance, the respondent began the nursing program at the college. She obtained employment through the work study program at the college.

In sum, the facts in the record are inconsistent with the conclusion that the respondent would not have benefited from further services. As I have detailed, the respondent made extraordinary efforts in obtaining services, the mental health care workers assisting the respondent with her reunification efforts held the virtually unanimous view that she had made significant and

meaningful progress in becoming a better parent, and the testimony of Stone and McNamara clearly indicated that the respondent had made the difficult acknowledgment that her children had been sexually abused by her boyfriend and that she had failed to protect them. On the basis of my scrupulous review of the record, I conclude that there is not substantial evidence in the record to support the trial court's conclusion that the respondent would not have benefited from further services.

Finally, I believe that scrupulous review of the record reveals that the great weight of the evidence supports the conclusion that termination of the respondent's parental rights was not in the best interests of the children. Stone testified that in her opinion, it was in the best interests of the children to be reunified with the respondent. She based her opinion on her observations of the strong bond between the respondent and her children, the significant support network that the respondent had established and the progress that the respondent had made toward becoming a parent who can physically and psychologically protect her children. Stone testified that the corporal punishment that the respondent used during the initial reunification with Marcus was not an ongoing concern. In her opinion, the respondent's actions during those incidents did not represent her normal parenting style, and instead were responses to extreme stress. She based this opinion on the fact that, during the second reunification with Marcus, no similar incidents had occurred.

McNamara who was questioned as to whether the termination of the respondent's parental rights was in the best interest of each individual child, testified in great detail that termination was not in each child's best interest. She based her opinion on the bond that the respondent shared with each child, the strong commitment she has to the children, her willingness to learn

and change in order to be reunified with them, and her ability to differentiate the children according to their age, according to their individual personalities, and to make herself available to them in ways that respond to each child's needs.

Specifically, as to Jaime, McNamara testified that the bond between Jaime and the respondent is very strong, and that Jaime has told her that he wants to live at home with the respondent. She also based her opinion on the fact that Jaime is a very active child, and the respondent is able to set appropriate boundaries for him. She has observed the respondent encourage Jaime's learning needs, and noted that Jaime made progress in his speech development while he was briefly reunified with the respondent.

As to Melody, McNamara testified that the bond between her and the respondent is very strong, and Melody has expressed her desire to be reunified with the respondent. McNamara observed that Melody functioned with the other children as the "older sister," and that the respondent was able to relate to her in that role, and also show interest in Melody's activities and interests, while at the same time providing an environment that minimizes Melody's tendency to "act out." McNamara viewed it as significant that the respondent likely would continue her course of seeking out support networks, and use those skills to advocate for Melody in the school setting, and to encourage Melody to become involved in the church.

As to Melinda, McNamara testified that there was a strong bond between her and the respondent, and between her and her other siblings. She testified that Melinda is a good student, and that the respondent, being a person who values education, would encourage that. Melinda also participates in church activities, another pursuit that the respondent values and would

foster and encourage. McNamara commented specifically on the respondent's willingness to participate in family therapy, and stated that such therapy would be an essential component of any plan to return Melinda, as well as the other children, to the home.

As to Jenira, McNamara testified that the bond between her and the respondent, as well as that between her and her siblings, is very strong. McNamara opined that the respondent would encourage Jenira's budding intellectual curiosity and her interest in church activities. She testified that the respondent's tenacity and consistency would be a significant resource that would aid her in reunifying with Jenira, as well as the other children. She noted that over the years that the children had been in the department's custody, the respondent had missed only one visit.

With regard to Neri Jasmin, McNamara testified that she shares a strong bond with the respondent, despite having been removed from the home at such a young age. She exhibits excitement and anticipation in relation to upcoming visits and interacts with the respondent as her mother. The same attributes that make reunification with the respondent in the best interests of the other children also persuade McNamara that reunification would serve Neri Jasmin's best interests.

McNamara testified that, despite Marcus' behavioral problems, he has a strong bond with his siblings, and they with him. That bond, rather than his behavioral problems, according to McNamara, should be the focus in determining whether it is in the best interests of the children to be reunified with the respondent.

McNamara also testified regarding the seven factors that the trial court must consider in making its determination that termination is in the best interest of the

child. See General Statutes § 17a-112 (k).[12] As to the timeliness, nature and extent of the services offered and provided by the department, McNamara stated that, in her opinion, the nature of the services offered by the department had not been the most beneficial. The respondent, she observed, had been responsible for actively seeking out the many counseling, educational and community services that had assisted her in preparing to be reunified with the children. That initiative on the part of the respondent speaks strongly of her

[12] "In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interest of the child. In arriving at this decision, the court is mandated to consider and make written findings delineated in [§ 17a-112 (k)]." (Internal quotation marks omitted.) *In re Trevon G.*, 109 Conn. App. 782, 794–95, 952 A.2d 1280 (2008).

General Statutes § 17a-112 (k) provides: "Except in the case where termination is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

commitment to reunification. Regarding the second factor, whether the department made reasonable efforts toward reunification, McNamara testified that, beyond stating that reunification was the projected goal, the department displayed little commitment toward effecting reunification. For instance, despite the need for increased visitation, and the respondent's commitment to visitation, she noted that there was no progression of visitation—either by increasing the frequency and duration of the visits or by allowing some unsupervised visitation. She also testified as to the minimal amount of family therapy provided to the family, a service that the experts agreed was essential as part of a reunification plan. McNamara also pointed to the failed attempt at reunification with Jaime, Marcus and the respondent, stating that she had not been notified that Jaime had been reunified with the respondent, and found out about his removal only afterward. In her opinion, the department unnecessarily and prematurely removed Jaime on the basis of issues that could have been addressed while Jaime remained with the respondent. As to the third factor, McNamara testified that the respondent had complied with the specific steps ordered by the court, and that the respondent's compliance persuaded McNamara that the respondent was committed to doing whatever is necessary to achieve reunification with her children. As to the fourth prong, the feelings and emotional ties between the children and the parent, McNamara testified without hesitation that the ties between the respondent and her children are strong. The fifth factor, the age of the children, is also a factor that McNamara believed supported reunification, as the children are young enough that reunification is a reasonable goal. The sixth factor, the efforts that the respondent has made to adjust her circumstances, conduct and conditions to make it in the best interests of the children to return home, is one that

McNamara testified strongly favors the respondent, because of the exceptional efforts that the respondent has taken to improve herself as a parent. She also considered it highly significant that the respondent openly acknowledged to McNamara her role in and responsibility for the sexual abuse suffered by her children.[13]

In contrast to the confident and informed testimony offered by McNamara and Stone that termination of the respondent's parental rights would not be in the best interests of the children, the trial court relied on Rogers' testimony alone that Melody was still experiencing post-traumatic stress disorder, and expressed anxiety regarding the return to the respondent. This must be understood in conjunction with the failure of the department to provide family therapy for Melody and the respondent, therapy that would have assisted Melody in dealing with her anxieties. Family therapy still would be an available option as part of a reunification program between Melody and the respondent. Also, contrary to Rogers' testimony, McNamara testified that the bond between Melody and the respondent is strong, and that Melody expressed a desire to be reunited with the respondent. Regarding Melinda, the court stated that she is fearful of being returned to the respondent. Again, this is an issue that should have been addressed in timely and consistent family therapy, and still could be. Additionally, McNamara testified that the bond between Melinda and the respondent is strong. As for Neri Jasmin, the court stated only that she was still an infant when removed from the respondent's care. McNamara observed, however, that despite Neri Jasmin's early removal, she is strongly bonded to the respondent and

[13] McNamara was not asked, and did not testify, regarding the seventh factor, "the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent." General Statutes § 17a-112 (k) (7).

to her siblings. The trial court acknowledged that the bond between Jaime and the respondent is strong, but relied on the failed reunification attempt in concluding that reunification was not in his best interest. The failure of the reunification, however, was in large part due to the department's premature removal of Jaime and Marcus, without attempting to address the issues while allowing the respondent to retain custody. Regarding Jenira, the court stated only that she views the foster parents as her psychological parents. This is discredited by McNamara's testimony.

On the basis of the foregoing, I emphasize the wisdom—and the necessity—of subjecting the factual record underlying this and other judgments terminating parental rights to a scrupulous review. A searching review of the record properly recognizes the extraordinary significance of the rights as well as the extreme and irreversible nature of termination. See *Troxel* v. *Granville*, supra, 530 U.S. 65; *M.L.B.* v. *S.L.J.*, supra, 519 U.S. 118. If that level of heightened review were to apply to this appeal, I firmly believe that the proper resolution would be to reverse the trial court's judgment terminating the respondent's parental rights. The record falls far short of providing substantial evidence to support the conclusion that the department met its burden of showing by clear and convincing evidence that the department made reasonable efforts to reunify the children, that the respondent was unable or unwilling to benefit from the offers of and provision of services to the point where she could be considered to be a parental resource for reunification, and that termination of the respondent's parental rights was in the best interests of the children. After a scrupulous review of the record, I would conclude, therefore, that the trial court's judgment was clearly erroneous. Because we currently do not conduct scrupulous review of the factual record in cases such as this one—although I urge that we do—

I have no choice but to concur with the majority opinion in affirming the judgment of the trial court.